

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-11-2001

# Brown v. Muhlenberg Twp

Precedential or Non-Precedential:

Docket 00-1846

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation
"Brown v. Muhlenberg Twp" (2001). *2001 Decisions.* Paper 234.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/234

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 11, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 00-1846

KIM BROWN; DAVID BROWN, H/W
Appellants

v.

MUHLENBERG TOWNSHIP; BOARD OF SUPERVISORS OF
MUHLENBERG TOWNSHIP; MUHLENBERG TOWNSHIP
POLICE DEPARTMENT; ROBERT M. FLANAGAN,
individually and/or as Chief of Police of Muhlenberg
Township; ROBERT D. EBERLY, individually and/or as
Patrolman of Muhlenberg Township; HARLEY SMITH,
individually and/or as Chief of Police of
Muhlenberg Township

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 99-cv-01076)
District Judge: Honorable John P. Fullam

Argued May 15, 2001

BEFORE: SCIRICA, GARTH and STAPLETON,
Circuit Judges

(Opinion Filed: October 11, 2001)

Thomas A. Whelihan
Reger & Rizzo
800 Kings Highway North –
 Suite 203
Cherry Hill, NJ 08034
 and
Deirdre A. Agnew (Argued)
1450 East Boot Road
West Chester, PA 19380
 Attorneys for Appellants

Enger McCartney-Smith (Argued)
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
 Attorney for Amicus Curiae
Animal Legal Defense Fund

Anthony R. Sherr (Argued)
Mayers, Mennies & Sherr
3031 Walton Road, Building A,
 Suite 330
P.O. Box 1547
Blue Bell, PA 19422
 and
L. Rostaing Tharaud (Argued)
Marshall, Dennehey, Warner,
 Coleman & Goggin
1845 Walnut Street – 16th Floor
Philadelphia, PA 19103
 Attorneys for Appellees

OPINION OF THE COURT

STAPLETON, Circuit Judge:

This is a civil rights action arising out of the shooting of a pet dog. The plaintiffs/appellants are Kim and David Brown, the owners of the pet. Police Officer Robert Eberly is alleged to be the primary constitutional tortfeasor. Officer Eberly's employer, Muhlenberg Township, its Board of Supervisors, and two of its Chiefs of Police are also alleged to be responsible for Officer Eberly's constitutional torts on various theories. Additionally, the Browns assert a state law claim. The District Court granted summary judgment to the defendants on all claims.

We first address the facts and law concerning whether a constitutional violation occurred. We then examine whether the defendants other than Officer Eberly share responsibility for any constitutional violations that may have occurred. Finally, we focus on the state law claim. Because this case comes to us on appeal from the District Court's grant of summary judgment to the defendants, we view the facts in the light most favorable to the Browns, drawing every reasonable inference in their favor. See Beers–Capitol v. Whetzel, 256 F.3d 120, 130 n.6 (3d Cir. 2001).

I. FACTS

The Browns lived in a residential section of Reading, Pennsylvania. On the morning of April 28, 1998, they were in the process of moving. Kim was upstairs packing, while David was loading the car. Immi, their three year old Rottweiler pet, had been placed in the Browns' fenced yard. Although the Browns had not secured a dog license for her, Immi wore a bright pink, one inch wide collar with many tags: her rabies tag, her microchip tag, a guardian angel tag, an identification tag with the Browns' address and telephone number, and the Browns' prior Rottweiler's lifetime license. Unbeknownst to the Browns, the latch on the back gate of their fence had failed, and Immi had wandered into the adjacent parking lot beyond the fence.

3

A stranger parked in the lot observed Immi as she wandered about in it. After three or four minutes of sniffing and casually walking near the fence, Immi approached the sidewalk along the street on which the Browns lived. As she reached the curb, Officer Eberly was passing in his patrol car. Seeing Immi, he pulled over, parked across the street, and approached her. He clapped his hands and called to her. Immi barked several times and then withdrew, circling around a vehicle in the parking lot that was approximately twenty feet from the curb. Having crossed the street and entered the parking lot, Officer Eberly walked to a position ten to twelve feet from Immi. Immi was stationary and not growling or barking. According to the stranger observing from his car, Immi "did not display any aggressive behavior towards [Officer Eberly] and never tried to attack him."

At this point, Kim Brown looked out of an open, screened window of her house. She saw Officer Eberly not more than fifty feet away. He and Immi were facing one another. Officer Eberly reached for his gun. Kim screamed as loudly as she could, "That's my dog, don't shoot!" Her husband heard her and came running from the back of the house. Officer Eberly hesitated a few seconds and then pointed his gun at Immi. Kim tried to break through the window's screen and screamed, "No!"

Officer Eberly then fired five shots at Immi. Immi fell to the ground immediately after the first shot, and Officer Eberly continued firing as she tried to crawl away. One bullet entered Immi's right mid-neck region; three or four bullets entered Immi's hind end.

Immi had lived with the Browns pre-school aged children for most of her three years and had not previously been violent or aggressive towards anyone.

Based on these facts and the reasonable inferences that can be drawn from them, we are thus faced with a situation in which a municipal law enforcement officer intentionally and repeatedly shot a pet without any provocation and with knowledge that it belonged to the family who lived in the adjacent house and was available to take custody.

4

## II. OFFICER EBERLY

### A. Unreasonable Seizure

The Browns claim that Officer Eberly violated their constitutionally secured right to be free from unreasonable governmental seizures of their property. The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." The people's "effects" include their personal property. See United States v. Place, 462 U.S. 696, 701 (1983) (detention of luggage held to be a Fourth Amendment seizure). A Fourth Amendment "seizure" of personal property occurs when "there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984). Destroying property meaningfully interferes with an individual's possessory interest in that property. See id. at 124-25. "[T]he destruction of property by state officials poses as much of a threat, if not more, to people's right to be `secure . . . in their effects' as does the physical taking of them." Fuller v. Vines, 36 F.3d 65, 68 (9th Cir. 1994).

The Browns had a possessory interest in their pet. In Pennsylvania, by statute, "All dogs are . . . declared to be personal property and subjects of theft." 3 Pa. Cons. Stat. Ann. S 459-601(a). See Miller v. Peraino , 626 A.2d 637, 640 (Pa. Super. Ct. 1993); Daughen v. Fox, 539 A.2d 858, 864 n.4 (Pa. Super. Ct. 1988).1 It necessarily follows that Immi was property protected by the Fourth Amendment and that Officer Eberly's destruction of her constituted a Fourth Amendment seizure. Accordingly, we join two of our sister courts of appeals in holding that the killing of a person's dog by a law enforcement officer constitutes a seizure

_____

1. Officer Eberly argues that an unlicensed dog under Pennsylvania law is as a matter of law an abandoned dog. We find no authority for this proposition and, accepting the evidence tendered by the Browns, are unpersuaded that Immi should be regarded as having been abandoned.

5

under the Fourth Amendment. Fuller, 36 F.3d at 68; Lesher v. Reed, 12 F.3d 148, 150-51 (8th Cir. 1994).

To be constitutionally permissible, then, Officer Eberly's seizure must have been "reasonable." "In the ordinary case, the [Supreme] Court has viewed a seizure of personal property as per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." Place, 462 U.S. at 701. Where the governmental interest justifying a seizure is sufficiently compelling and the nature and extent of the intrusion occasioned by the seizure is not disproportionate to that interest, the seizure may be reasonable even though effected without a warrant. Thus, when the state claims a right to make a warrantless seizure, we "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Id. at 703. Even when the state's interest is sufficiently compelling to justify a warrantless seizure that is minimally intrusive, the seizure will be unreasonable if it is disproportionately intrusive. While the state's interest in drug interdiction, for example, is sufficient to render reasonable a brief but warrantless detention of suspicious luggage for a canine "sniff," such detention for ninety minutes constitutes an unreasonable seizure under the Fourth Amendment. Id.

Where a pet is found at large, the state undoubtedly has an interest in restraining it so that it will pose no danger to the person or property of others. The dog catcher thus does not violate the Fourth Amendment when he or she takes a stray into custody. Moreover, the state's interest in protecting life and property may be implicated when there is reason to believe the pet poses an imminent danger.[2] In

_____

2. The state's interest in the protection of life and property undoubtedly occasioned enactment of 3 P.S. S 459-302(a) which states in relevant part:

> It shall be the duty of every police officer, State dog warden, employee of the department or animal control officer to seize and

6

the latter case, the state's interest may even justify the extreme intrusion occasioned by the destruction of the pet in the owner's presence.3 This does not mean, however, that the state may, consistent with the Fourth Amendment, destroy a pet when it poses no immediate danger and the owner is looking on, obviously desirous of retaining custody. Striking the balance required by Place , we hold that Officer Eberly's destruction of Immi could be found to be an unreasonable seizure within the meaning of the Fourth Amendment.

This brings us to Officer Eberly's qualified immunity defense. Qualified immunity absolves Officer Eberly from liability and, indeed, from the burdens of defending this suit, if he can show that a reasonable officer with the information he possessed at the time could have believed that his conduct was lawful in light of the law that was clearly established on April 28, 1998. Anderson v. Creighton, 483 U.S. 635 (1987). In order for a right to be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640. While "[t]his is not to say that an official's action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . it is to say

_____

> detain any dog which is found running at large, either upon the public streets or highways of the Commonwealth, or upon the property of a person other than the owner of such dog, and unaccompanied by the owner. Every police officer, State dog warden, employee of the department or animal control officer may humanely kill any dog which is found running at large and is deemed after due
> consideration by the police officer, State dog warden, employee of the department or animal control officer to constitute a threat to the
> public health and welfare.

While Officer Eberly relies on this statute, it would be clearly inapposite
should the trier of fact credit the evidence that has been tendered by the Browns.

3. See Place, 462 U.S. at 705 (contrasting the degree of intrusion when a seizure of personal effects is made "after the owner has relinquished control of the property to a third party [and when the seizure is] from the
immediate custody and control of the owner").

that in the light of pre-existing law the unlawfulness must be apparent." Id. (citations omitted).

As we have previously noted, the Supreme Court's 1984 decision in United States v. Jacobson reaffirmed the well established proposition that a Fourth Amendment seizure of property occurs whenever there is some meaningful intrusion with an individual's possessory interest in that property and that destruction of property thus constitutes a seizure under the Fourth Amendment. Moreover, we believe that, at least after the enactment of 3 P.S.S 459-601 in 1983, a reasonable law enforcement officer in Officer Eberly's position would have realized that a person's dog is his personal property under Pennsylvania law. Finally, we believe that, based on Place and the cases there reviewed, a reasonable officer would have understood that it was unlawful for him to destroy a citizen's personal property in the absence of a substantial public interest that would be served by the destruction.

If the facts asserted by the Browns are found to be true, we conclude that a reasonable officer in Officer Eberly's position could not have applied these well established principles to the situation before him and have concluded that he could lawfully destroy a pet who posed no imminent danger and whose owners were known, available, and desirous of assuming custody.4 In other words, it would

_____

4. If the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of the law, it is not necessary that there be binding precedent from this circuit so advising. As we explained in Pro v. Donatucci , 81 F.3d 1282, 1292 (3d Cir. 1996) (footnote omitted):

> In Bieregu v. Reno, 59 F.3d at 1459, we noted that "the absence of a previous decision from our court on the constitutionality of the conduct at issue is not dispositive" in determining whether the particular constitutional right at issue was clearly established at a
> particular time, and stated that the standard "require[s] `some but not precise factual correspondence between relevant precedents and the conduct at issue,' " id. (citing In re City of Philadelphia Litig., 49
> F.3d at 970) in order to be satisfied. Moreover, Bieregu found law to
> be clearly established despite a circuit split, as long as "no gaping
> divide has emerged in the jurisprudence such that defendants could

8

have been apparent to a reasonable officer that shooting
Immi would be unlawful. Accordingly, Officer Eberly has
not established that he is entitled to qualified immunity.5

_____

reasonably expect this circuit to rule" to the contrary. 59 F.3d at
1458-59. Thus, the split between the Courts of Appeals for the Fifth
and the Fourth Circuits at the time of Donatucci's actions does not
preclude our deciding that Pro's right to respond to the subpoena
was clearly established.

In this case, the only court of appeals decisions addressing the relevant
issue, Fuller and Lesher, had reached the conclusion that the state's
killing of a person's dog without a public interest justification constituted
a Fourth Amendment violation. That unavoidable conclusion was
reached based on a common sense application of the Supreme Court
precedent we have discussed.

Doe v. Delie, 2001 WL 817680 (3d Cir., July 19, 2001), holds only that
conflicting and materially distinguishable district court decisions did not
render a right clearly established in the Third Circuit.

5. There is no question but that evidence currently in the record would
support findings of fact under which there would be no Fourth
Amendment violation, and Officer Eberly would be entitled to qualified
immunity in any event. That is not the issue before us, however. If there
is evidence from which a trier of fact could conclude that a constitutional
violation occurred and that a reasonable officer would have known based
on clearly established law that he was violating the Browns' rights,
summary judgment was inappropriate. See, e.g. , Johnson v. Jones, 515
U.S. 304 (1995).

Despite its protestations to the contrary, the dissent does not accept
the record evidence in the light most favorable to the Browns and draw
all reasonable inferences in their favor. Contrary to the assertions of the
dissent, Officer Eberly's testimony that Immi was acting aggressively
before the shooting and that he did not hear Kim Brown claim ownership
before he shot is not undisputed. Kim Brown's testimony would support
a finding that there was no provocation for the shooting, as would the
testimony of the disinterested observer in the parking lot. With respect
to Officer Eberly's knowledge that the dog's owner was available and
anxious to take custody, Russell Yoder, a neighbor of the Browns, gave
the following testimony:

Q. And what did you hear?

A. Okay. The things that I heard -- the first thing was, I heard a

woman starting to shout and she was shouting, Don't shoot, don't

B. Procedural Due Process

Under the Fourteenth Amendment, a state may not
deprive a citizen of his property without affording him due

_____

　　　shoot. . . . I really couldn't see anything there. But then I heard
--
　　　I heard her say, That's my dog, that's my dog, don't shoot. So all
of
　　　a sudden, right after that there were five shots that just -- they
just
　　　went bang, bang, bang, bang, bang, bang, and I -- I got down on
　　　the -- behind my door `cause I didn't know where these shots were
　　　coming from, . . . .

App. at 449-450.

The District Court was not free to ignore this sworn testimony given
before the Civil Service Commission. It was the equivalent of an affidavit
and while it technically may have been hearsay, so too are affidavits.
Federal Rule of Civil Procedure 56(e) requires only that "supporting and
opposing [sworn statements] be made on personal knowledge, . . . set
forth such facts as would be admissible in evidence, and . . . show that
the [declarant] is competent to testify to the matters stated therein."
The
transcript of Yoder's sworn testimony satisfies all three of these
requirements. See also Williams v. Borough of West Chester Pa., 891
F.2d 458 (3d Cir. 1989) (holding, on the authority of Celotex v. Catrett,
477 U.S. 317 (1986), that "hearsay evidence produced in a affidavit
opposing summary judgment may be considered if the out-of-court
declarant could later present that evidence through direct testimony,
i.e.,
`in a form that would be admissible at trial.' ") (quoting from Celotex,
891
F.2d at 466, n.6).

Moreover, ignoring Yoder's testimony would not change the result. Kim
Brown testified that when she yelled Officer Eberly was in close
proximity and hesitated in apparent response to her shout before
shooting. Her testimony would clearly support a finding that Officer
Eberly was on notice of the Browns' ownership and availability before he
shot. On cross examination, for example, she testified as follows:

　　　Q. And you believe that you yelled something out?

　　　A. Yes.

　　　Q. But you don't know what you yelled?

　　　A. I believe the first thing I said was, "That's my dog." I'm
almost

positive.

Q. You say you're almost positive. Does that mean you know that you did that or you're not sure?

10

process of law. U.S. Const. amend. XIV, S 1. Property
interests created by state law are protected under that
amendment, see Board of Regents v. Roth, 408 U.S. 564
(1972), and destruction of such property by the state
constitutes a "deprivation" thereof, see Parratt v. Taylor,
451 U.S. 527 (1981). It follows that Officer Eberly's
destruction of Immi deprived the Browns of their property
and that they were entitled to due process. See id.

Usually, the process that is constitutionally "due" must
be afforded before the deprivation occurs -- the state must

_____

A. Not one hundred percent sure.

Q. What percentage would you give to that?

A. Ninety percent.

Q. Why do you have any doubt as to what you yelled?

A. I don't know what order I said everything in. Again, it happened
so fast.

Q. How long after you yelled something did the shooting start?

A. A few seconds. I thought he hesitated.

Q. What led you to believe that he hesitated?

A. There seemed to be quite a few seconds that elapsed between
me seeing his arm move and seeing the actual gun.

* * *

Q. Do you know whether or not he heard you yelling?

A. I don't know what he heard.

Q. You don't know whether he heard you yelling, right?

A. No. I don't know what he heard.

Q. Nothing that you saw or witnessed gave you the impression one
way or the other whether he heard you yell?

A. Yes. He hesitated.

Q. What do you mean by hesitated, what hesitated?

A. His arm stopped moving for a few seconds. I saw it moving, it
stopped, then he brought the gun out.

App. at 106–07; App. at 108.

11

provide predeprivation process. See Zinermon v. Burch, 494 U.S. 113, 127 (1990). When the complained of conduct is "random and unauthorized" (so that state authorities cannot predict when such unsanctioned deprivations will occur), however, the "very nature of the deprivation ma[kes] predeprivation process impossible." Id. at 137. In such situations, postdeprivation process is all that is due. See id.

Contrary to the Browns' suggestion, we conclude that no predeprivation process was constitutionally required here. In Hudson v. Palmer, 468 U.S. 517 (1984), a prison guard was alleged to have intentionally destroyed noncontraband personal property of an inmate while conducting an authorized "shakedown" of his cell. The inmate claimed that this constituted a deprivation of property without due process of law in violation of the Fourteenth Amendment. The Supreme Court held that no predeprivation process was required and that the state's provision of a postdeprivation remedy in the form of a suit for damages provided all the process that was due. With respect to predeprivation process, the Court found that the guard's destruction of the property was the "random and unauthorized conduct of a state employee" and that "predeprivation procedures [were] simply `impracticable.' " Id. at 533. The inmate, like the Browns, argued that the state's agent (there, the guard; here, Officer Eberly) could have provided predeprivation process and was, therefore, constitutionally required to do so. Rejecting this contention, the Court observed:

> Whether an individual employee himself is able to foresee a deprivation is simply of no consequence. The controlling inquiry is solely whether the state is in a position to provide for predeprivation process.

Hudson, 468 U.S. at 534. There is no material distinction between the Browns' case and Hudson.

Hudson is also helpful with respect to the sufficiency of the postdeprivation process provided to the Browns by Pennsylvania. At oral argument, the Browns acknowledged that Pennsylvania afforded them a judicial remedy: a civil action for conversion. Like the inmate in Hudson , however, they argue that their state remedy was inadequate because

12

the state-employed tortfeasor was protected by sovereign immunity. This argument fails for the same reason it failed in Hudson. Pennsylvania law, like the state law in Hudson, deprives public employees of immunity for intentional torts. Section 8550 of Pennsylvania's Political Subdivision Tort Claim Act denies immunity to any public employee when the court finds that his or her conduct constitutes, among other things, "willful misconduct." "Willful misconduct" in this context "has the same meaning as the term`intentional tort.' " Delate v. Kolle, 667 A.2d 1218, 1221 (Pa. Commw. Ct. 1995); see also Kuzel v. Krause, 658 A.2d 856, 859 (Pa. Commw. Ct. 1995). Viewing the facts in the light most favorable to the Browns, they were afforded postdeprivation judicial process by the law of Pennsylvania, and such process was all that was due. Summary judgment was properly entered against the Browns on their procedural due process claim.

Because the civil rights act liability of the remaining defendants is predicated on there being a constitutional violation committed by Officer Eberly, we will hereafter confine our discussion to civil rights liability in connection with the possible Fourth Amendment violation.6

III. THE TOWNSHIP AND ITS SUPERVISORS

Regardless of the nature of underlying right alleged to have been aggrieved, Muhlenberg Township and its Board of Supervisors can be liable for any constitutional

_____

6. At the conclusion of the argument section of the Browns' brief devoted to their procedural due process argument, they assert in conclusory fashion that Officer Eberly's conduct also violated their right to substantive due process. Because of the cursory treatment of this contention, we do not regard a substantive due process issue as properly before us. We note, however, that "not all property interests worthy of procedural due process protections are protected by the concept of substantive due process." Reich v. Beharry , 883 F.2d 239, 244 (3d Cir. 1989). We know of no authority which clearly establishes that one in the Browns' position has been deprived of a property interest of the "quality" required for substantive due process protection. DeBlasio v. Zoning Board of Adjustment, 53 F.3d 592, 600 (3d Cir. 1995). Accordingly, if we were to assume a substantive due process violation, Officer Eberly would be entitled to qualified immunity on this claim.

13

deprivations suffered by the Browns only if "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385 (1989).7 A direct causal link can be shown in two ways. First, "a body [such as Muhlenberg Township or its Board of Supervisors] may . . . be sued directly if it is alleged to have caused a constitutional tort through `a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.' " City of Saint Louis v. Praprotnik, 485 U.S. 112, 121 (quoting Monell v. Dept. of Soc. Serv., 436 U.S. 658,690 (1978)). Second, the Browns could establish the requisite causal link between the constitutional deprivation and a custom, "even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell, 436 U.S. at 690-91. A"custom, or usage, of [a] State" for S 1983 purposes"must have the force of law by virtue of the persistent practices of state officials." Adickes v. S. H. Kress & Co., 398 U.S. 144, 167 (1970). In either event, the municipality's liability can be predicated "only [upon] acts for which the municipality itself is actually responsible . . . ." Praprotnik, 485 U.S. at 123. "[O]nly those municipal officials who have`final policymaking authority' may by their actions subject the government to S 1983 liability." Id.  (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986)).

The official policy or adopted custom that subjects a municipality to S 1983 liability may relate to the training of police officers. A municipality's failure to train its police officers can subject it to liability, however, "only where [it] reflects a `deliberate' or `conscious' choice by [the] municipality -- a `policy' as defined" in Supreme Court cases. City of Canton, 489 U.S. at 388. Moreover, such liability arises "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. The scope of failure to

_____

7. The requirement that liability rest on a direct causal link between the municipal policy or custom and the alleged constitutional deprivation precludes respondeat-superior liability. See Monell v. Dept. of Social Services, 436 U.S. 690, 691 (1978).

train liability is a narrow one. As the Supreme Court has explained:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

Id. at 390.

The Browns have not satisfied their burden of establishing facts sufficient to support their claim of municipal liability. They have tendered no evidence of any official policy endorsing Officer Eberly's conduct. Indeed, the Township's policy manual spells out a progressive use of force policy relating to animals that is inconsistent with Officer Eberly's conduct. The policy states the"[t]he degree of force [the officer should use] is dependent upon the facts surrounding the situation the officer faces. Only a reasonable and necessary amount of force will be used." The policy authorizes the use of chemical agents, such as oleoresin capsicum (or "pepper") spray, "for defensive purposes." The policy explicitly states that"[t]his weapon may also be used against attacking dogs . . . ." The policy specifically addressed the use of firearms against animals:

> An officer may use a firearm to kill a dangerous animal or terminate the suffering of a critically injured or sick animal when other means of disposal are impractical. Whenever possible, the owner of the animal to be destroyed shall be contacted and written permission obtained. In the event the owner cannot be located, the identification of any available witnesses who will attest to the need to destroy the animal will be recorded by the officer. In any case, whenever the shooting of an animal is necessary, the shooting must be done cautiously to protect and [sic] nearby persons or property.

15

Nor have the Browns established the existence of an unconstitutional governmental custom. They argue, in essence, that Muhlenberg Township and its Board of Supervisors customarily condoned a practice of employing excessive force in handling dogs at large. The record, however, simply will not support an inference that there was a pattern of such excessive force, much less that the Board customarily condoned it.

The Browns' evidence also falls far short of establishing their failure to train claim. To survive summary judgment on a failure to train theory, the Browns must present evidence that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference. City of Canton, 489 U.S. at 390. While it is true that Muhlenberg police officers received no formal training specifically directed to handling dogs, they did have the guidance of the policy manual, and we believe a reasonable trier of fact could not conclude that the need for further guidance was so obvious as to indicate deliberate indifference on the part of the Board to the Browns' constitutional rights.

IV. POLICE CHIEFS FLANAGAN AND SMITH

The Browns also allege that Police Chief Robert Flanagan and Police Chief Harley Smith are responsible for Officer Eberly's constitutional torts. Their argument is not that Chief Flanagan or Chief Smith directed Officer Eberly to deprive the Browns of any constitutionally protected right. Rather, the Browns focus on the alleged inadequacy of the Chiefs' supervision.

In Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989), this court identified the elements of a supervisory liability claim. The plaintiff must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the

16

underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure. We emphasized that "it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." Sample, 885 F.2d at 1118. Rather, the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a "relationship between the `identified deficiency' and the `ultimate injury.' " Id.

These elements have not been satisfied with respect to either Chief of Police. As to Chief Smith, the Browns have offered no explanation as to how he could be responsible for a shooting that occurred almost two years after he retired. As to Chief Flanagan, the Browns have identified two supervisory practices or procedures he allegedly failed to employ. The first -- that he failed to train Muhlenberg police officers on the proper use of force against animals -- must be rejected for the same reason we rejected the similar claim against the Board of Supervisors. The policy manual in effect at the time of the shooting gave instructions on how to handle situations of this kind, and a reasonable trier of fact could not conclude that the failure to provide more formal training evidenced deliberate indifference.

The Browns' second theory is that Chief Flanagan must have been aware of Officer Eberly's alleged practice of using excessive force against animals and nevertheless failed to take appropriate disciplinary action. There is no evidence that Chief Flanagan had knowledge of any prior excessive use of force on animals by Officer Eberly, however. Nor is there any evidence of a pattern of excessive use of such force by Eberly which would support a finding that Chief Flanagan should have been aware that Eberly posed a threat in situations like the one in question. While Officer Eberly acknowledged during his deposition that he had killed dogs on four prior occasions during his sixteen year career, only one of the incidents he recounted produced a complaint, and the uncontradicted evidence with respect to the others reveals nothing comparable to the Browns' version of the facts in the case at bar. In two of these

17

incidents, the dog charged either Eberly or a fellow officer. In the third, a stray dog had been terrorizing the neighborhood and extended, unsuccessful efforts had been made to catch it. The only incident that generated a complaint about excessive use of force by Officer Eberly against a dog occurred in approximately 1988, some ten years before the incident giving rise to this suit and more than eight years before Chief Flanagan assumed office on July 15, 1996.

We will affirm the District Court's grant of summary judgment in favor of both Chief Flanagan and Chief Smith.

V. THE STATE LAW CLAIM

The Browns claim that they are entitled to recover from Officer Eberly for intentional infliction of emotional distress.8 They emphasize that a reasonable trier of fact could conclude that Officer Eberly, without any justification whatsoever, shot Immi five times in front of her owner, deliberately ignoring the fact that the owner was screaming in protest and pleading with him not to shoot. They also point to evidence indicating that the experience of observing the slaughter of her beloved pet exacerbated Kim's pre-existing post traumatic stress disorder, leaving her with nightmares, headaches, and severe anxiety.

In Williams v. Guzzardi, 875 F.2d 46 (3d Cir. 1989), we predicted that the Supreme Court of Pennsylvania would recognize the tort of intentional infliction of emotional distress as described in Restatement (Second) of Torts S 46 (1965). We have found no Pennsylvania case since that time which alters this view. Section 46 provides in relevant part:9

_____

8. The Browns argue in their brief that Chiefs Flanagan and Smith are not entitled to sovereign immunity under Pennsylvania law. They do not indicate, however, what state tort claim against them was improperly rejected by the District Court and we cannot hypothesize one that the record would support. We thus address only the Browns' intentional infliction of emotional distress claim which is directed only towards Officer Eberly.

9. Subsection (2) of Section 46 provides as follows:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Accordingly, the elements that the Browns must satisfy are (1) that Officer Eberly's conduct was extreme and outrageous, (2) that his conduct caused a person severe emotional distress, and (3) that he acted intending to cause that person such distress or with knowledge that such distress was substantially certain to occur.10 As we have indicated, the record would clearly support a finding that Officer Eberly intended to inflict, or knew he would inflict, severe emotional distress on Kim Brown. Moreover, Officer Eberly does not challenge the sufficiency of the evidence tendered by the Browns concerning severe emotional distress. This leaves the issue of whether the courts of Pennsylvania would permit a trier of fact to conclude that Officer Eberly's conduct was extreme and outrageous. According to the Restatement commentary, conduct is sufficient to make out a claim for emotional distress if "the recitation of the facts to an average member of the

_____

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm.

Contrary to the suggestion of the amicus, we are not persuaded that the Supreme Court of Pennsylvania would regard this subsection as having any relevance here.

10. See Comment (i) to S 46 providing in relevant part:

The rule stated in this Section applies where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct.

19

community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!' " Restatement (Second) of Torts S 46, cmt. d.

One Pennsylvania case has recognized an emotional distress claim in a situation like ours. In Banasczek v. Kowalski, No. 9009 of 1978, 1979 WL 489 (C.P. Luzerne County Jan. 30, 1979), the plaintiff asserted a claim for emotional distress stemming from the defendant's shooting of two of the plaintiff 's dogs. In what appears to have been a case of first impression in Pennsylvania, the court in Banasczek held that Pennsylvania recognized the tort of intentional infliction of emotional distress generally and then, following the authority of cases from Texas and Florida, concluded that "the more enlightened view is to allow recovery for emotional distress in the instance of the malicious destruction of a pet . . . ." Id. at *2.

Officer Eberly argues in essence that the killing of a pet under any circumstances would not be recognized by the Pennsylvania courts as extreme or outrageous. We believe the Banasczek court was correct in rejecting a similar contention. Given the strength of community sentiment against at least extreme forms of animal abuse and the substantial emotional investment that pet owners frequently make in their pets, we would not expect the Supreme Court of Pennsylvania to rule out all liability predicated on the killing of a pet.

More specifically, we predict that the Pennsylvania courts would permit a trier of fact to return a verdict for the plaintiff in an intentional infliction of emotional distress case where it is shown that a police officer's attention was called to the severe emotional distress of the pet's owner, he hesitated before shooting, and he then attempted to fire five bullets into the pet within the owner's view and without justification. In such cases, the malicious behavior is directed to the owner as well as to the pet, with the potential for serious emotional injury to the owner being readily apparent. In the relatively few cases where similar issues have arisen in other jurisdictions, the prevailing view is consistent with the one we take. See Nelson v. Percy, 540 A.2d 1035, 1036 (Vt. 1987); Richardson v. Fairbanks N. Star Borough, 705 P.2d 454, 456 (Alaska 1985); LaPorte v.

20

Associated Indeps., Inc., 163 So. 2d 267, 269 (Fla. 1964); Katsaris v. Cook, 225 Cal. Rptr. 531, 538 (Cal. Ct. App. 1986); Gill v. Brown, 695 P.2d 1276, 1277-78 (Idaho Ct. App. 1985); City of Garland v. White, 368 S.W.2d 12, 17 (Tex. Civ. App. 1963)

We find ourselves in disagreement with Officer Eberly's reading of Daughen v. Fox, 539 A.2d 858 (Pa. Super. Ct. 1988), and Miller v. Peraino, 626 A.2d 637 (Pa. Super. Ct. 1993), two Pennsylvania cases involving the death of a pet in which recovery pursuant to section 46 was denied. Daughen holds that a veterinarian's negligent operation on a family pet, without more, was not extreme and outrageous conduct for purposes of section 46.

Miller stands for the proposition that the defendant must have intentionally caused a person severe emotional distress. The vicious beating of the family dog in Miller, if proven at trial, would by all accounts have been extreme and outrageous, and we do not read the court in Miller to disagree. Rather, the Miller plaintiffs failed to allege, much less produce evidence, that the tortfeasor's heinous acts against the dog were performed with the intention of inflicting severe emotional distress on the dog's owners. This is not so in the case at bar, where the Browns have produced evidence from which a reasonable trier of fact could conclude that Officer Eberly shot Immi either intending to cause Kim Brown severe emotional distress or with the knowledge that the infliction of such distress on her would be virtually certain.

Officer Eberly is not entitled to sovereign immunity under state law with respect to the intentional infliction of emotional distress claim because the record will support a conclusion that he acted intentionally.11

_____

11. We agree with the District Court that Officer Eberly was entitled to summary judgment with respect to David Brown's intentional infliction of emotional distress claim. The record indicates that he did not witness the shooting and would not support a finding that Officer Eberly was even aware of his existence.

21

VI.

The judgment of the District Court in favor of all defendants except Officer Eberly will be affirmed. The judgment in favor of Officer Eberly will be reversed, and the case will be remanded for further proceedings consistent with this opinion.

22

GARTH, Circuit Judge, dissenting and concurring:

The issue that has divided this panel and which should concern every judge, every police officer and every official who claims qualified immunity by virtue of his or her office is: how do we determine the second prong of the qualified immunity doctrine -- i.e., when is the constitutional right which is claimed to have been violated clearly established so as to visit liability on the official?

Distressingly, the majority opinion fails to announce a standard by which the bench and the bar can test whether a particular legal principle -- that is the particular constitutional right -- is "clearly established" for purposes of qualified immunity. I strongly urge that in deciding this second prong, at the least a balancing process should be undertaken whereby the factors to be balanced are:

> (1) Was the particular right which was alleged to have been violated specifically defined, or did it have to be constructed or gleaned from analogous general precepts? See Wilson v. Layne, 526 U.S. 605 (1999).

> (2) Has that particular right ever been discussed or announced by either the Supreme Court or by this Circuit?

> (3) If neither the Supreme Court nor this Circuit has pronounced such a right, have there been persuasive appellate decisions of other circuit courts -- and by that I mean more than just one or two -- so that the particular right could be said to be known generally?

> (4) Were the circumstances under which such a right was announced of the nature that an official who claimed qualified immunity would have, acting objectively under pre-existing law, reasonably understood that his act or conduct was unlawful? 1

_____

1. The Second Circuit has at least crafted a standard against which the second prong of the qualified immunity analysis can be tested. That standard is similar to the one I have just suggested. See Horne v. Coughin, 155 F.3d 26, 29 (2d Cir. 1998).

Tested by these factors, it is clear to me that Officer Eberly, when he shot and killed the Brown's Rottweiler which was unleashed, uncontrolled, barking and presenting an aggressive appearance, could not have reasonably understood that his act was unlawful. As such, he is entitled to qualified immunity and the District Court's judgment should be affirmed.

I

I concede that it is not an easy task to determine when a right is clearly established. The precedents (with some exception), measured by the standard outlined above, would agree that breaking into a home without a warrant would offend Fourth Amendment rights. Accordingly, that right is clearly established. Similarly, the precedents would agree that inducing a coerced confession violates a defendant's Fifth Amendment rights. Accordingly, that right is clearly established. By the same token, the precedents would agree that torturing a prison inmate violates the Eighth Amendment. Accordingly, that right is clearly established. But -- I do not know of any precedent or any judge, other than the members of the majority, who can responsibly hold that even if the Fourth Amendment is violated by a police officer shooting an unleashed, uncontrolled, barking Rottweiler which, as I point out in note 4 (infra), is an aggressive and possibly threatening large animal (certainly not a pussycat!), that such a right, if there is one, has been clearly established  in any jurisdiction, let alone in this Circuit.

A. Specifically Defined

Can it really be held that the Fourth Amendment"seizure of property" right was readily and generally known to apply to the shooting of a Rottweiler which was loose on the street? Can we really say that this particular Fourth Amendment principle was defined with particular specificity and was therefore clearly established for purposes of qualified immunity? I am aware of no authority which defines the principle with sufficient particularity so as to make it applicable to the situation here.

24

B. Lack of Binding Precedent

Can we really hold that the decisional law of the Supreme Court and this Court effectively equates the two concepts discussed above? Or -- that Fourth Amendment principles of either court have at any time been applied to the shooting of an animal such as the Brown's Rottweiler under the circumstances faced by Officer Eberly? The majority has furnished us with no such authority and I know of none.

C. Absence of Out-of-Circuit Authority

Well then, can we look at other appellate decisions that are relevant -- if not on-point, at least near the point -- and which are persuasive? As I explain later in referring to Lesher v. Reed, 12 F.3d 148, 150 (8th Cir. 1994), and Fuller v. Vines, 36 F.3d 65 (9th Cir. 1994) (see text at 31-32, infra), neither of those cases is relevant, neither case is on-point, neither case involves the same circumstances, and neither case can be applied here in the context of Officer Eberly's actions. Needless to say, neither case is persuasive.

D. Pre-Existing Law

Are there then cases under pre-existing law which would have or should have been known to Eberly, leading to his reasonable understanding that by shooting the dog which confronted him, he was doing something unlawful? If there are such cases, we have not been informed of them by the majority and I have not been able to find any.

II

In determining whether a legal principle is "clearly established," if we cannot look to state law, as we cannot, see Doe v. Delie, 2001 WL 817680 (3d Cir. July 19, 2001) ("officials do not forfeit qualified immunity from suit for violation of a federal constitutional right because they failed to comply with a clear state statute.") (citations omitted), and we cannot look to district court opinions or to other circuit pronouncements even if they are relevant (and those

25

cited by the majority are not, see text at 31-32, infra), id., and we in the Third Circuit have never addressed this issue in the present context, then how can we possibly expect a police officer such as Eberly to understand that he would be violating a right that has never been specifically defined, let alone clearly established, in this or any other jurisdiction. As the majority opinion points out, citing to Anderson v. Creighton, 483 U.S. 638 (1987), the"contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640; maj. op. at 7. That is to say that "in light of preexisting law, the unlawfulness must be apparent." Anderson, 483 U.S. at 640. How has the unlawful conduct of Officer Eberly, if indeed it was unlawful, been shown by the majority to be "apparent?" It is no answer, nor is it sufficient, to proclaim ipse dixit, as the majority has, "that Officer Eberly has not established that he is entitled to qualified immunity." Maj. op. at 9.

The relevant focus has to be on the final part of the qualified immunity inquiry -- whether the right allegedly violated was clearly established so that a reasonable official in Eberly's position would understand that what he was doing violated that right. Anderson, 483 U.S. at 641. If there has never been a constitutional right articulated that would prevent a police officer from shooting a barking, unleashed, uncontrolled dog such as the Rottweiler which was killed -- as there has not been in this jurisdiction or any others -- how can the absence of such a right as postulated by the majority constitute a clearly established right so as to hold Eberly liable?

In my opinion, the majority has erred in its unanalytic resolution of this issue, and its resolution should be rejected because it makes bad law in this case and in future cases where the clearly established element must be decided. Because there is no standard announced other than the one I have advanced, and there is no basis or authority supporting the "clearly established" holding of the majority, in my opinion, its holding here will dilute -- if not destroy -- the essential clearly established  element announced by the Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800 (1982) and explained in Anderson v. Creighton, 483 U.S. 635 (1987).

26

Here, because the record establishes that Officer Eberly was qualifiedly immune when he shot the Browns' Rottweiler, I would affirm the District Court's judgment. Eberly's immunity springs from the fact that even assuming a Fourth Amendment violation -- an assumption bearing many serious concerns and one that carries a great deal of baggage under the circumstances here -- there was no clearly established constitutional right that Eberly violated to warrant holding him liable -- any more than there was a clearly established right that the majority concedes immunizes Eberly from the Brown's substantive due process claim. See maj. op at 13, n. 6. 2

Moreover, recognizing that in the qualified immunity context, the determination of whether Eberly's actions were reasonable in the face of conflicting evidence can only be made by resort to affidavit and testimony supporting the Browns' position, I conclude that Eberly's actions were not only objectively reasonable for Fourth Amendment purposes, but did not, and could not, constitute an intentional infliction of emotional distress.

_____

2. I have assumed that a Fourth Amendment violation has occurred for purposes of this case. I point out, however, that the District Court adverted to the dog being abandoned, undoubtedly because it was unleashed, out on the street, under no control of an owner, and was barking at a police officer. Inasmuch as an element of the Fourth Amendment violation requires a determination of being unreasonable which may fall within the jury's purview but which is a decision which could not be rendered by a jury if qualified immunity attached, because the grant of qualified immunity would preclude a trial being held, I point out no more than that the issue of a Fourth Amendment violation in the case of an unleashed, uncontrolled Rottweiler barking at a police officer on a public street leaves much to be desired in the way of satisfying the strictures of a Fourth Amendment seizure, and is completely distinguishable from Fuller v. Vines, 26 F.3d 65 (9th Cir. 1994) (holding that plaintiffs stated a Fourth Amendment violation in alleging that police officers killed plaintiffs' dog in the plaintiff 's yard) and Lesher v.
Reed, 12 F.3d 148 (8th Cir. 1994) (holding that police officers' removal of a dog from inside plaintiffs' home fits "within the meaning of the Fourth Amendment").

27

III

Pennsylvania law provides that "It shall be the duty of every police officer or state dog warden to seize and detain any licensed dog which is found running at large , either upon the public streets or highways of the Commonwealth, or upon the property of a person other than the owner of such dog, and unaccompanied by the owner or keeper." 3 P.S. S 459-302 (emphasis added). By statute it is provided that "Every police officer or state dog warden may kill any dog which is found running at large and is deemed after due consideration by the police officer or state dog warden to constitute a threat to the public health and welfare." 3 P.S. S 459-303 (emphasis added). Officer Eberly testified: "Because of the way [s]he was barking and growling at me, I perceived [her] as a threat to me, but I had a responsibility to do something to get this dog into custody as a police officer. That's part of my responsibility for stray dogs." A-394.

IV

Let me amplify my earlier analysis explaining the second prong -- the clearly established prong-- of the qualified immunity doctrine. Government officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818; see also Malley v. Briggs, 475 U.S. 335, 341 (1986) (observing that "all but the plainly incompetent or those who knowingly violate the law" are protected by qualified immunity). Whether a government official asserting qualified immunity may be held personally liable for conduct that allegedly violated a constitutional or statutory right depends on the "objective legal reasonableness" of the action. Anderson v. Creighton, 483 U.S. 635, 639 (1987). As the Court explained, and as I have stated above:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless

28

the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Id.

The Supreme Court has admonished that the particular right at issue must be defined with specificity."[W]hat `clearly established' means in this context depends largely upon the level of generality at which the relevant legal rule is to be identified." Wilson v. Layne, 526 U.S. 605, 614 (1999) (internal quotations and citation omitted)."It could plausibly be asserted that any violation of the Fourth Amendment is `clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of police. . . . However, . . . the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." Id. at 615 (emphasis added) (citations omitted). The Court in Wilson held that bringing the media into a private home to film the execution of a warrant violated the Fourth Amendment, but held that the right was not clearly established to warrant finding the officers liable for damages. The Court defined the specificity of the right as follows: "the appropriate question is objective inquiry of whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful, in light of clearly established law and the information the officers possessed." Id.

In the present case, the appropriate question is whether Officer Eberly as a reasonable officer could have perceived that the Rottweiler which was unleashed, uncontrolled, and running free on a public way and was barking at him, was a threat to him or to the public health and welfare. If so, as I believe all reasonable persons would agree, then his shooting the unleashed, uncontrolled and barking Rottweiler was lawful.

As I have indicated, I am willing to assume a Fourth Amendment constitutional right (see n. 2, supra), but contrary to the majority, I cannot say that Eberly's conduct in shooting an unleashed Rottweiler which any reasonable

person would perceive as threatening and which was under the control of no owner and was barking, is clearly established as a constitutional violation in the Third Circuit. To the contrary, as I have earlier stated and as the majority must agree, my research has not revealed any Third Circuit precedent involving a police officer or other official who has ever been held liable or non-immune as a result of shooting an uncontrolled animal running freely on the public highway and which was perceived as being a threat to the public safety or to the officer. Nor have I found any out-of-circuit precedent that could be deemed as constituting clearly-established law and which could be said to have informed Officer Eberly that in shooting the Rottweiler he was violating the Browns' Fourth Amendment rights.

In my view, even if non-circuit precedents existed, which they do not, such precedents are non-binding decisions which do not "clearly establish" law for purposes of qualified immunity. The Supreme Court has not defined the level of precedent required to render a right " clearly established." Harlow, 457 U.S. at 818 n. 32 ("we need not define here the circumstances under which the state of the law should be evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District.").

Several courts, and most importantly the Third Circuit, have held that non-binding precedent does not make a right "clearly established." See Doe v. Delie, 2001 WL 817680 (3d Cir. July 19, 2001) (holding that district court decisions did not render a right clearly established in the Third Circuit); Hansen v. Soldenwagner, 19 F.3d 573, 578 n. 6 (11th Cir. 1994) (concluding that "the case law of one other circuit cannot settle the law in this circuit to the point of it being `clearly established.' "); Knight v. Mills, 836 F.2d 659, 668 (1st Cir. 1987) (holding that decisions by two other circuits cannot create clearly established law when the Supreme Court had reserved the issue); Ohio Civ. Serv. Employees Ass'n v. Seiter, 858 F.2d 1171, 1177 (6th Cir. 1988) (concluding that decisions of other circuits clearly establish the law only if they "both point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority

30

as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.").

In Doe v. Delie, 2001 WL 817680 (3d Cir. July 19, 2001), which found a constitutional right of privacy of a prison inmate's medical information (a decision which I questioned, see id. (Garth, J., dissenting), but then appropriately found that there was no clearly established right that was violated (a decision with which I agreed), we held that neither state nor out-of-circuit precedents could satisfy the clearly established element of the immunity doctrine. We did so because there was no authority to which we could look in any jurisdiction, including our own, whereby a prison official would understand that by prescribing a medication so that others might hear the prescription, the prisoner's right to privacy had been violated. Just so here, where even if the Brown's claimed constitutional right was confirmed, the majority opinion has not substantiated that it would have been apparent to a reasonable officer -- in the circumstances present when the Brown's Rottweiler confronted Eberly -- that shooting the Rottweiler would be unlawful.

Indeed, the only decisional law in our sister circuits is decisional law by the Eighth Circuit (Lesher) and by the Ninth Circuit (Fuller) involving dogs seized within the property of their respective owners -- a far cry from an unleashed dog on the public street out of its owners' control. These cases do not render the law clearly established in either the Eighth or Ninth Circuits, to say nothing of my own Circuit -- the Third. Thus Officer Eberly is entitled to qualified immunity.

In Lesher v. Reed, 12 F.3d 148, 150 (8th Cir. 1994), the government officials "removed [plaintiffs'] dog from their home." Similarly, in Fuller v. Vines, 36 F.3d 65 (9th Cir. 1994), the police officers killed plaintiffs' dog in the plaintiff 's yard. In neither case were the dogs running free and uncontrolled and in neither case was there a perception of a threat to the public safety. Here, in contrast, the Browns' Rottweiler was outside their control, outside the Browns' property, and unleashed and barking

31

on the public street giving every appearance of a threat to public safety.

Officer Eberly saw the Browns' Rottweiler running free without a leash obstructing traffic on Madison Avenue in Muhlenberg. Eberly parked his police car, exited, walked toward the dog and clapped his hands and called to her. The Rottweiler then barked at Eberly. One witness, Christopher Grim, testified that the Rottweiler"was getting ugly with the officer. . . . It was showing its teeth and barking and growling and it had -- it was po[i]sed, back end dip position . . . . I don't know if you've ever noticed when dogs get really like wild or violent they come and they bear down on their back legs in kind of a striking-type thing." A-432. Eberly testified:

> The dog at that point, as it came around the back[of a parked car], came towards me, barking and growling and, again, put his feet forward and took a stance and took like a, he was protecting, whatever, stance. At that point the dog went back on his hind legs and came forward off his hind legs, and it looked like the dog was going to attack me from how he sprang forward. At that time I though he was coming for me. When he came off his back legs and came towards me, I raised my weapon and fired.

A-396-97; see also Eberly's Testimony, A-406 (explaining that "she rocked back and forth on her hind legs and started to come forward. It looked like, from my experience, this dog was lunging and going to attack me."). Eberly shot five times, hitting the Rottweiler three or four times.3

Even disregarding Eberly's and Grim's testimony, and viewing the facts, as I must, in the light most favorable to

_____

3. In a later part of this dissent, I have criticized the majority for having
relied upon the testimony of Russell Yoder, which does not satisfy the requirements of Fed. R. Evid. 804(b)(1) and which is therefore inadmissible hearsay. It may well be that Grim's testimony suffers from the same failing, in which case I should not consider it any more than Yoder's testimony. Accordingly, I have disregarded not only Grim's testimony, but also the testimony of Officer Eberly, since we are bound on summary judgment to view all of the evidence and to credit all of the inferences in favor of the plaintiffs.

the Browns, Eberly's actions were objectively reasonable. It is uncontested that the dog was a Rottweiler,4 that it was unleashed and uncontrolled, and that it had been barking.

_____

4. Surprisingly, the majority opinion has failed to inform the reader about the characteristics and nature of a Rottweiler that should be taken into consideration in assessing the reasonableness of Eberly's actions. While the record does not disclose this information, we can take judicial notice of these traits from the American Kennel Club's descriptions (www.akc.org) and the American Rottweiler Club's"Introducing the Rottweiler" (www.amrottclub.org).

The American Rottweiler Club describes a Rottweiler as "a robust, powerful and loyal breed. . . . He is an outstanding companion and guard but ownership of a Rottweiler carries much greater than average legal and moral responsibilities, due to traits possessed by this breed, their size and strength. . . . Males range from 24" to 27" at the shoulder and 95-135 lbs in weight. Females are somewhat smaller, 22" to 25" tall and 80 to 100 lbs."

"The Rottweiler is very strong for its size. It has been used in Europe to pull carts and retains the compact musculature desirable in a draft animal. A full grown adult can easily knock a human off his feet. . . . Obedience training is a must because of the animal's size and strength; you must be able to maintain complete control of your animal at all times. . . . [Aggressiveness] varies with the individual dog to some degree, although all have a strong territorial instinct and will defend their master's home, car and property from intruders. Rottweilers have also been known to bully or bluff their owners or other people, a trait that is most disconcerting. . . . Although the Rottweiler does not usually bite without provocation, even being cornered and held by one of these dogs is a very unnerving experience for meter men, delivery persons or neighbors wandering into the yard while the owner is absent." American Rottweiler Club, "Introducing the Rottweiler."

The American Kennel Club states, "[t]he ideal Rottweiler is a medium large, robust and powerful dog. . . . His compact and substantial build denotes great strength, agility and endurance. Dogs are characteristically more massive throughout with larger frame and heavier bone than bitches. . . . Dogs [range from] 24 inches to 27 inches. Bitches [range from] 22 inches to 25 inches."

Although it is sad to learn of the death or injury of any pet, I cannot overlook the apprehension that an individual -- particularly a police officer, who has a duty to protect and ensure the safety of the public -- may have when faced with an unleashed, uncontrolled, barking Rottweiler.

Nothing in the record establishes the majority's conclusions that Eberly knew the family to whom the dog belonged, that the Browns owned the dog and lived in an adjacent house, or that the Browns were available to take the Rottweiler in custody. Nor can the record be read to show that Eberly shot the Rottweiler without any provocation. See Maj. Op. at 4. Moreover, Eberly's testimony that he heard and saw no one before shooting is also not disputed. Contrary to the majority's statement of facts, Ms. Brown's testimony concerning when and what she shouted to Eberly is both ambiguous and equivocal. She did not state that when the officer reached for his gun, she shouted "That's my dog, don't shoot!" Maj. Op. at 4. Rather, referring to what Ms. Brown herself testified to, these are the operative facts:

> Q: So you saw his right arm move and you yelled something?
>
> A: Yes.
>
> Q: What did you yell?
>
> A: At that point I'm not exactly sure what I yelled. I know once he started shooting I know what I yelled. I just started screaming.
>
> . . .
>
> Q: You don't know what you yelled?
>
> A: I believe it was, "That's my dog," but I'm not positive.
>
> . . .
>
> Q: As you sit here today, do you know what you yelled?
>
> A: I don't know in order. I know that words must have come out of my mouth, but I don't know for certain what I said.

A-104-06 (emphasis added).

Because Ms. Brown did not know what she said and when she said it, reliance cannot be had on her testimony as related in the majority opinion. All we can glean from the record is that at some point in time after Eberly fired at the

34

Rottweiler, she started screaming. But we cannot know what she said and at what point she claimed the Rottweiler as hers. Moreover, in light of the record which I have just reproduced above, it cannot be said that Eberly heard anything until after he had fired his weapon.5

In particular, I stress that the majority's conclusion that Ms. Brown claimed ownership of the dog prior to the shooting -- because it depends so heavily on Yoder's testimony -- is flawed and inaccurate. Let me explain why.

The majority opinion in its extensive footnote 5, in an effort to bolster its conclusion that Eberly knew that the Rottweiler's owner was available and anxious to take custody, unfortunately recites testimony which was not available for consideration by the District Court. It is by no means available for consideration by us, and should not be relied upon in the majority opinion because the testimony of Russell Yoder was taken in connection with a Civil Service Commission Hearing, and is inadmissible into evidence under Fed. R. Evid. 804(b)(1).

That Rule requires such testimony, in order to be admissible as an exception to the hearsay rule, to be accompanied by proof (1) that the declarant -- in this case Yoder -- was unavailable to testify, (2) that the testimony was taken at a hearing, deposition, civil action or proceeding, and (3) that the party against whom the testimony is now offered -- in this case Eberly-- had an opportunity to test the testimony by examination. New Jersey Turnpike Authority v. PPG Industries, Inc. , 197 F.3d 96, 110 (3d Cir. 1999); Kirk v. Raymark Industries, Inc., 61 F.3d 147, 164-65 (3d Cir. 1995).

Here, Yoder's testimony was taken before a Civil Service Commission with nothing appearing in the record to establish his availability or unavailability in the instant proceeding, nor can we tell from the record, by which we are bound, whether the Commission Hearing -- not a court

_____

5. Although in the qualified immunity summary judgment context we could not rely upon Eberly's testimony if it was disputed, here no one can contest Eberly's statement made in his deposition that "[a]fter the shooting, that's when I heard voices."

35

proceeding -- satisfied the other elements of the Rule so as to permit consideration in this summary judgment proceeding. See New Jersey Turnpike, 197 F.3d at 110. Nor is the majority opinion's explanation and its citations to Williams v. Borough of West Chester, Pennsylvania , 891 F.2d 458, 466 n. 12 (3d Cir. 1990) and Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) an answer to Yoder's unavailability. Williams, referring to Celotex, is no more than dictum, while Celotex refers only to appropriate admissible affidavits or depositions, neither of which appear in the instant record other than through Yoder's administrative testimony. Hence by any evidentiary test, Yoder's prior testimony before an administrative tribunal was not admissible for consideration here because Yoder must be considered "available" on this record where it is undisputed that there is no finding to that effect.

Indeed, the District Court judge did not, so far as I can tell, rely on that evidence in any particular and it has only been resurrected by the majority on this appeal so as to shore up its conclusion that Eberly should be liable. It would have been an abuse of discretion for the District Court to have admitted and considered this testimony without a finding of unavailability, see Kirk , 61 F.3d at 165, and the burden of proof of unavailability, as well as the other elements of Rule 804(b)(1), rests upon the proponents of the testimony -- here, the Browns. An examination of the record reveals that it is completely silent as to Yoder's availability. Hence, it is inappropriate -- indeed it is error -- for the majority to rely on inadmissible hearsay testimony whose reliability has not been tested. Without Yoder's testimony -- testimony which the majority opinion relies upon so heavily -- the majority's conclusion simply cannot stand.

V

It is crystal clear to me that even in the face of a Fourth Amendment violation, which as I have noted may be problematical, see n.1, supra, Eberly's conduct as a police officer in discharge of his statutory duty was not only appropriate but no clearly established constitutional right stemming from the occurrence of his shooting the Browns'

36

dog would or could have been known to any reasonable person. Unfortunately, the majority opinion has not seen fit to announce a standard for clearly established doctrine in the context of qualified immunity, and by failing to do so, it obviously could not relate the actions of Officer Eberly to an unarticulated standard. Thus, by this failure, it has abdicated this Court's responsibility to balance"the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." Anderson, 483 U.S. at 639 (internal quotations omitted), and has made it impossible for officials within our jurisdiction to reasonably anticipate when their conduct may give rise to liability for damages.

Because I cannot join such an opinion which disregards the content of an acknowledged doctrine, I would affirm, in its entirety, the District Court's judgment of May 22, 2000 which granted summary judgment for Officer Eberly and the other named defendants.6 To the extent that the majority holds otherwise, I respectfully dissent.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

---

6. For largely the same reasons discussed above, I would also hold -- as I stated earlier -- that Eberly's conduct, based solely on the record supporting the Browns' position, could not constitute an intentional infliction of emotional distress.