Sara R. ALEXANDER, Individually and as Administratrix of the Estate of Alvin A. Alexander, Deceased, Plaintiff-Appellant,

v.

CONVEYORS & DUMPERS, INC., Defendant-Appellee.

No. 83–4143.

United States Court of Appeals, Fifth Circuit.

May 14, 1984.

Jacobs, Griffith, Pearson, Eddins & Povall, Benjamin E. Griffith, Cleveland, Miss., for plaintiff-appellant.

Lake, Tindall, Hunger & Thackston, W. Wayne Drinkwater, Andrew N. Alexander, III, Greenville, Miss., for defendant-appellee.

Before CLARK, Chief Judge, GARZA and JOLLY, Circuit Judges.

PER CURIAM:

On June 1, 1981, Alvin (Bud) Alexander was killed while performing maintenance work on a conveyor, or "skip hoist," located in the dialysate department mixing room of Travenol Laboratories' plant in Cleveland, Mississippi. He was survived by his wife Sara R. Alexander and three minor children.

Alexander's duties as a Travenol maintenance mechanic included periodic maintenance and repair of equipment and machinery located within Travenol's manufacturing facility. On the day of the accident it became necessary for Alexander to remove a leaking gear box on the skip hoist in question. The skip hoist was used to lift quantities of sugar, salt, and various chemicals approximately seventeen feet and dump them into elevated vats to be mixed

into kidney dialysis solution. The salt and sugar were placed into a stainless steel hopper which was lifted by two steel cables powered by an electric motor. At the top of the hopper's travel, it rotated on guide rails dumping its contents into the vat. The hopper's position when it dumped its load into the vat was referred to as the "full-dump" or "full-tilt" position. At trial, the plaintiff argued that the skip hoist was in the full-dump position when Alexander attempted to repair it.

To remove the hoist's gear box, Alexander first removed the front two bolts securing the gear box to the frame of the skip hoist. There is some dispute as to whether he then began to remove the drive chain, or whether the gear box tilted upwards allowing slack in the drive chain, causing it to jump its sprockets. The slack in the drive chain caused the hopper, suspended in the air above Alexander, to fall, killing him.

The skip hoist had been manufactured by the defendant Conveyors & Dumpers (hereinafter C & D) and sold to Travenol in 1972. Mrs. Alexander brought this action against C & D, alleging claims based on strict liability in tort and breach of implied warranties of merchantability and fitness. The district court directed a verdict for the defendant on the breach of warranty claims, holding them barred by limitations. The jury returned a verdict for the defendant on the strict liability claim.

At trial, the plaintiff contended that the skip hoist was unreasonably dangerous to maintenance personnel in that the hopper, when in the full dump position, appeared to have pivoted past the center of gravity so that the illusion was created that the hopper would not fall even when all supporting apparatus was removed. The plaintiff further claimed the hoist was defective because of the absence of warnings of this illusory condition and because of the lack of safety devices which would have guarded against this type of accident.

C & D contended that the skip hoist was reasonably safe for its intended purpose, but defended the lawsuit primarily by arguing that Alexander had voluntarily assumed the risk involved in performing the maintenance work in the manner he chose.

### I.

Alexander's first point is that the district court erred in its instructions to the jury on the assumption of risk defense. Alexander claims that the instruction given was erroneous and that the district court erred in refusing the six instructions offered by the plaintiff.

The assumption of risk instruction offered by the defendant and given to the jury by the trial court, referred to as Instruction D–6, reads as follows:

> If you find from a preponderance of the evidence in this case that before the accident of June 1, 1981, Alvin Alexander knew *or must have known* that removal of the electric motor and gear box or disconnection of the drive chain while the bucket and the skip hoist was suspended in the air would cause the bucket to fall, and if you further find that Alvin Alexander knew *or must have known* that the falling bucket would injure someone who was underneath it, and if you further find that *despite this knowledge and appreciation,* if any, Alvin Alexander *deliberately* caused the drive chain to become disconnected while the bucket was suspended above him, then you must return a verdict for the defendant, Conveyors & Dumpers.

Record, vol. 6, at 892–93 (emphasis added).

Both parties agree that there are three essential elements to assumption of the risk under Mississippi law:

> (1) Knowledge on the part of the injured party of a condition inconsistent with his safety; (2) appreciation by the injured party of the danger in the condition; and (3) a deliberate and voluntary choice on the part of the injured party to expose his person to that danger in such a manner as to register assent on [sic] the continuance of the dangerous condition.

*Elias v. New Laurel Radio Station, Inc.,* 245 Miss. 170, 146 So.2d 558, 561–62 (1962). Whether an injured party assumed a partic-

ular risk of harm is, therefore, measured by a subjective standard. *Herod v. Grant*, 262 So.2d 781, 782 (Miss.1972); *Daves v. Reed*, 222 So.2d 411, 414 (Miss.1969). The injured party's conduct must be judged in the light of his own knowledge rather than what he "should have known." *See Griffin v. Holliday*, 233 So.2d 820, 822 (Miss. 1970); *Wallace v. J.C. Penney Co., Inc.*, 236 Miss. 367, 109 So.2d 876, 878 (1959).

The instruction given in the instant case permitted the jury to return a verdict for C & D if it found that Alexander "knew or must have known" and appreciated the risk presented by removing the gear box with the hopper in the full dump position. C & D argues that the instruction was proper, relying on *Herod v. Grant*, 262 So.2d 781 (Miss.1972) and *Alley v. Praschak Mach. Co.*, 366 So.2d 661 (Miss.1979). In both cases, the Mississippi Supreme Court quoted with approval from 57 Am.Jur.2d *Negligence* § 282 (1971):

> Where the facts are such that the plaintiff must have had knowledge of the hazard, the situation is equivalent to actual knowledge and there may be assumption of the risk. In some cases the circumstances may show as a matter of law that the risk was understood and appreciated, and often they may present in that particular a question of fact for the jury. Also, the plaintiff may not close his eyes to obvious dangers, and cannot recover where he was in possession of facts from which he would be legally charged with appreciation of the danger.

*Alley v. Praschak Mach. Co., supra*, at 664; *Herod v. Grant, supra*, at 783.

In *Herod* and *Alley*, the Mississippi Supreme Court approved the use of a "must have known" jury instruction in cases where the evidence supported a finding that the injured party had the equivalent of actual knowledge of risk. In *Herod*, the Supreme Court said, "[A]n understanding of the danger involved and consent to assume the risk may be shown by circumstances." 262 So.2d at 782, *quoting* 57 Am.Jur.2d *Negligence* § 282 (1971). In *Al-*

*ley*, the Supreme Court found no reversible error in an instruction which permitted a jury to find that a plaintiff had assumed a risk that a piece of machinery would be activated by his repair "when he did not know whether electrical power to the machine was on." 366 So.2d at 665. Although *Herod* and *Alley* do not present comprehensive analyses of the assumption of the risk defense in Mississippi law, those cases do indicate to us that Mississippi follows, generally, the formulations of *American Jurisprudence, Second.*

Parsing the *American Jurisprudence, Second* language quoted with approval in Mississippi cases, we believe that there are two circumstances in which an assumption of the risk instruction may be given: (1) when the evidence shows that the plaintiff had actual knowledge of the danger, or (2) when the evidence shows that the danger was so obvious that the plaintiff must have had knowledge of it. In either of these circumstances, the subjective knowledge of the plaintiff is at issue. Determining which of the two instructions is applicable depends on the type of proof offered to establish the subjective state of the plaintiff's mind: a jury may find that a plaintiff "knew" of a danger when presented evidence of admissions by the plaintiff or other direct demonstrations of actual knowledge; a jury may find that a plaintiff "must have known" of a danger based on circumstantial evidence. *American Jurisprudence, Second* language cited with approval by the Mississippi Supreme Court establishes that either of these forms of proof may be offered to sustain an assumption of the risk defense:

> In cases involving the issue of assumption of risk, an understanding of the danger involved and consent to assume the risk may be shown by circumstances. However, in the absence of evidence that the injured person knew of the danger, *or* that the danger was so obvious that he must be taken to have known of it, it cannot be held that he assumed the risk of injury therefrom . . . .

57 Am.Jur.2d *Negligence* § 282 (1971), quoted in *Herod v. Grant*, 262 So.2d at 783, and *Braswell v. Economic Supply Co.*, 281 So.2d 669, 675 (Miss.1973) (emphasis added).

The fact that a "knew or must have known" instruction may be appropriate under Mississippi law does not end our inquiry, of course. We must decide whether the facts of this case justified the giving of either or both a "knew" and a "must have known" instruction. If neither, or only one, of the instructions was justified by the evidence, then the jury was improperly instructed, and we would have to remand the case for a new trial. We first consider whether evidence was presented in support of the instruction that Alexander "knew" of the danger.

Alexander adduced evidence tending to prove that when the hopper was in the full-dump position, it appeared as if it could not fall. Alexander argues that this false appearance of safety was a latent defect in the skip hoist, and that this defect was the cause of the accident. Cecil Tindall, Travenol's maintenance superintendent, and C.D. Sims, Travenol's maintenance supervisor and a Travenol employee for over thirty years, both testified that prior to the accident they believed the hopper would remain in the full-dump position if the gearbox were removed. (Record, vol. 4, at 382; vol. 3, at 100.) James Kendall, a Travenol maintenance mechanic for twenty years, testified similarly. (Record, vol. 4, at 317–18.)

Although this evidence suggests that Alexander also was unlikely to have known of the risk to which he subjected himself, it was directly contradicted by the deposition testimony of Doyle Weeks. Weeks, a material handler at Travenol, testified that Alexander had told him the hopper could fall from the full-tilt position. (Exhibit D–53.) Weeks also testified in his deposition that Alexander said the hopper would fall from this position if the skip hoist's drive chain broke. (Exhibit D–54.) At trial, Weeks contradicted his deposition testimony, saying that Alexander had not stated explicitly that the hopper could fall from the full-tilt position (Record, vol. 5, at 557) and that he and Alexander had never discussed what would happen if the drive chain broke or became disconnected. (Record, vol. 5, at 560–62.)

■ Even though flatly contradicted by his trial testimony, Weeks' deposition testimony, if believed by the jury, was sufficient to support a finding that Alexander knew that the hopper would fall if the drive chain broke or became disconnected. Moreover, this evidence was directly probative of Alexander's subjective knowledge of the risk, whereas the testimony of Tindall, Sims and Kendall was not. It is, of course, Alexander's own knowledge that is at issue here, and the fact that the alleged defect was not apparent to other Travenol employees is not conclusive on that issue. We conclude, then, that there was evidence to support a finding that Alexander "knew" of the danger to which he exposed himself.

We then turn to whether the district court correctly instructed the jury to find for C & D if Alexander "must have known" of the risk that the hopper would fall on him. As we noted, the Mississippi Supreme Court has approved the use of such an instruction in cases where, to use the language of *American Jurisprudence, Second*, "the danger is so obvious that [the injured person] must be taken to have known of it." In consonance with the language of the Mississippi cases, which repeatedly stress that assumption of the risk must be based on the subjective knowledge of the injured party, we can only read this language as referring to danger that is obvious *to the injured party*, and not to danger that is obvious to a hypothetical "reasonable man" or an ordinary person.

We inquire, then, whether there was evidence presented at this trial which, though not directly demonstrative of Alexander's actual knowledge, indicates that he must have known of the danger inherent in repairing the skip hoist in the manner he chose. We do find testimony in the record which justifies the "must have known" instruction. Doyle Weeks testified at trial

that Alexander had replaced the cables which lifted the hopper of the skip hoist. In order to do so, Weeks testified, Alexander "took the cables off the drum, rewound it, changed the cables." (Record, vol. 5, at 546.) James Kendall testified that anyone who had made this particular repair, as Alexander had done, "would be in a position to see that [the] cable drum did not have a brake on it ...." Kendall, in response to questions by the defense attorney, admitted that anyone who had looked at the cable drum would see that what held the hopper in its elevated position was "something inside [the] electric motor and gearbox." (Record, vol. 4, at 324–25.) It could be argued that the testimony of Weeks and Kendall does not fully support the "must have known" instruction because it does not establish the ultimate fact that it was obvious that the hopper would fall from the full-dump position, in which an appearance of safety was created. This final link in the evidentiary chain, however, is provided by the testimony of Homer Clapper, the Chief Executive Officer of C & D and an engineer familiar with the design of the skip hoists made by that company. Clapper testified that the fact that the hopper could fall even from the full-dump position was obvious. He stated, "If you change a cable, you can't help but notice that, unless it's in the full 'down' position, *in any other position* ... the cables are always taut. That means they're holding a load; they're trying to defy holding something up against gravity" (emphasis added). (Record, vol. 5, at 621–22.) Asked whether a maintenance man who had performed the repairs on the skip hoist that Alexander had performed would "understand that, if the [hopper] is put in the full 'dump' position and you knock the drive chain loose, the thing's going to fall," Clapper replied, "Yes." (Record, vol. 5, at 621.)

Therefore, in Clapper's opinion, because the cables remained taut in the full-dump position, it would have been obvious to Alexander that the hopper was held in place, not by gravity, but by the cables which were attached to the cable drum and the gear box assembly which Alexander attempted to remove. Kendall and C.D. Sims both stated that Alexander was more familiar with the skip hoist than anyone else at the Travenol plant; in fact, Alexander was responsible for preventive maintenance of the skip hoist, which required a monthly inspection of the machine. (Record, vol. 4, at 322–23; vol. 3, at 118, 125–26.) This testimony, if believed, is sufficient to establish that Alexander "must have known" that the drive chain assembly, including the gear box and the drive chain, which he removed was critical in holding up the hopper, even in the full-dump position.[1] This evidence is bolstered by the fact that every one of Alexander's co-workers who was asked stated that Alexander should not have attempted to remove the skip hoist's gear box while the hopper was elevated. Each stated that there were safe methods for performing the repair and that, had they seen Alexander attempting the repair in the manner he chose, they would have stopped him. (Record, vol. 3, at 136–38, 208–09; vol. 4, at 331–34, 385–87.)

Given the evidence presented at trial, the jury instruction was proper. The jury was instructed that, in order to find that Alexander assumed the risk of the hopper's falling on him, it first had to find that Alexander knew or must have known that the removal of the motor or the disconnection of the drive chain would cause the hopper to fall from the full-tilt position. The jury could have found this to be true if it believed the deposition testimony of

---

**1.** Our discussion up to this point has assumed that the hopper was in the full-dump position at the time of the accident. Alexander's "latent defect" argument is entirely reliant on the assumption that it was so placed; otherwise, the danger of the hopper's falling was clear. In fact, this issue was contested at trial, and some evidence was introduced which tended to prove that the hopper was in an elevated position but not in the full-dump position. The testimony established that it was common knowledge among Travenol workers that the hopper could fall from this position. This evidence provides further justification for the "must have known" instruction.

Doyle Weeks or if it believed that because of his experience in repairing the skip hoist, Alexander must have known that the hopper would not remain in the elevated position if the motor was disconnected. Second, the jury had to find that Alexander knew that if the hopper fell it would injure someone underneath it. This fact is established by uncontradicted testimony that Alexander warned Weeks not to stand under the hopper when it was in the full-tilt position because it was dangerous. Finally, the jury had to find that "despite this knowledge and appreciation, if any, ... Alexander deliberately caused the drive chain to become disconnected while the [hopper] was above him ...." Disassembly of the gear box and removal of the drive chain were essential to the repair Alexander agreed to perform. (Record, vol. 3, at 103–04.) The evidence presented at trial showed that Alexander either removed two bolts which held the skip hoist's gear box in place, causing the drive chain to become disconnected, or he deliberately disconnected the drive chain. (Record, vol. 4, at 304–06, 333–35, 376.) Although the instruction could have stated more clearly that subjective and not objective appreciation of the risk was at issue, and could have explained more clearly the legal meaning of "must have known," we find that, as a statement of the law applicable to this case, it was sufficient.

Alexander also complains that the trial court erred in refusing the plaintiff's assumption of risk instructions P–14 through P–19. These instructions detail various factors to be taken into consideration in determining whether the plaintiff assumed the risk. It is only required that the trial court correctly and adequately instruct the jury as to the law to be followed in deciding the issues, however; the court is not compelled to give even every correct instruction offered by the parties. Counsel had the opportunity to emphasize the matters in his favor contained in these proposed instructions during jury argument and we decline to hold that the trial court erred in refusing them.

II.

The district court granted a directed verdict for the defendant on Alexander's breach of warranty claims, holding them barred by the six-year statute of limitations provided by the Uniform Commercial Code, Miss.Code Ann. § 75–2–725 (1972). That section provides, in pertinent part:

(1) An action for breach of any contract for sale must be commenced within six (6) years after the cause of action has accrued.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *A breach of warranty occurs when tender of delivery is made,* except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Miss.Code Ann. § 75–2–725 (1972) (emphasis added). Under that section, Alexander's warranty claims were barred four years prior to the accident in question.

Alexander claims that the breach of warranty claims are in essence personal injury and wrongful death claims and that the applicable statute of limitations is Miss. Code Ann. § 15–1–49, which provides that "[a]ll actions for which no other period of limitations is prescribed shall be commenced within six years next after the cause of such action accrued, and not after." Alexander argues that the UCC statute of limitations applies only to claims for commercial loss between buyer and seller and does not apply to actions between consumers and manufacturers having no commercial relationship.

C & D argues that Alexander's warranty claims are purely statutory, arising from Mississippi's Uniform Commercial Code, and are governed by the UCC statute of limitations. C & D claims support from *Rutland v. Swift Chemical Company,* 351 So.2d 324 (Miss.1977), and *Maly v. Magnavox Company,* 460 F.Supp. 47 (N.D.Miss.

1978). Both cases lend support to C & D's argument; both, however, involved claims for property damage and not for personal injuries or wrongful death.

■ Lacking any controlling state judicial authority on this particular issue, we are called upon to perform some amount of soothsaying as to what the Mississippi courts would decide if confronted with similar facts. *Farmers and Bankers Life Ins. Co. v. St. Regis Paper Co.*, 456 F.2d 347 (5th Cir.1972). Although *Rutland v. Swift Chemical Company, supra,* was not a personal injury action, the Mississippi court's opinion therein does provide some insight into that court's construction of the UCC limitations statute. The plaintiff in *Rutland* brought a breach of implied warranty action against Swift Chemical Company for damages stemming from the poor performance of fertilizer manufactured by Swift and sold to the plaintiff by a retail establishment. The plaintiff filed suit approximately six years and one month after the purchase was made. While agreeing that § 75–2–725 was the applicable statute of limitations, the plaintiff contended that the case properly came within the future performance exception to the rule of breach upon delivery. The Mississippi Supreme Court rejected this argument, referring to the "plain" and "unmistakable" language and "clear intent" of the statute, which required the warranty to relate explicitly to the future performance of goods in order for the exception to apply. *Id.* at 325. The court referred to the fact that the legislature had provided only one exception to the general rule of the statute, thus evidencing its rejection of any implied exceptions. *Id.* at 325–26.

We find this reasoning sound and persuasive. The statute likewise contains no exception for the breach of an implied warranty resulting in personal injuries; the plain and unambiguous language of section 75–2–725 purports to treat all warranty breaches in the same manner. The UCC was designed to simplify and make uniform the law governing commercial transactions and to apply to all aspects and ramifications of a commercial transaction, whether sounding in contract, tort, or some other legal category. Furthermore, this appears to be the view in the majority of jurisdictions that have decided the specific issue at hand. *See* Annot., 20 A.L.R.4th 915 (1983).

Nor do we find any public policy reason for distinguishing between warranty actions for personal injuries and those alleging economic loss. While our decision would have been different prior to Mississippi's adoption of strict liability in tort, the inability to sue for breach of warranty more than six years after the date of the sale under the present circumstances is not, in our opinion, unconscionable. Mississippi's legislature has abolished any requirement of privity in negligence and strict liability actions, Miss.Code Ann. § 11–7–20 (1976),[2] and the statute of limitations governing those causes of action does not begin to run until the date of injury, *Ford Motor Co. v. Broadway*, 374 So.2d 207 (Miss.1979), thus providing the plaintiff with adequate remedy.

We hold that Alexander's breach of warranty actions were properly held barred by the district court.

### III.

We now turn to Alexander's remaining complaints, which are evidentiary in nature.

### A.

Alexander first complains of the trial court's failure to admit as an exhibit the 1957 American Standard Safety Code for Conveyors. The court allowed the plaintiff's experts to read from and to testify at length regarding the Code and the safety requirements contained therein, and per-

---

**2.** Miss.Code Ann. § 11–7–20 (1976) provides:
 In all causes of action for personal injury or property damage or economic loss brought on account of negligence, strict liability or breach of warranty, including actions brought under the provisions of the Uniform Commercial Code, privity shall not be a requirement to maintain said action.

mitted counsel to display photographic enlargements of relevant portions of the Code to the jury. The court admitted the Code into evidence under the "learned treatise" hearsay exception, Rule 803(18),[3] Federal Rules of Evidence. Rule 803(18) allows the admission into evidence of statements contained in learned treatises under proper circumstances, but provides that "[i]f admitted, the statements may be read into evidence but may not be received as exhibits." Alexander asserts that the Code should have been admitted under Rule 803(24),[4] as well as under various other rules.

■ While safety codes have traditionally been treated as coming within the learned treatise exception provided by Rule 803(18), we have previously indicated that "because they are inherently trustworthy and because of the expense and difficulty involved in assembling at trial those who have compiled such codes," they may also be admitted under the residual exception to the hearsay rule, Rule 803(24). *See Johnson v. William C. Ellis & Sons Iron Works*, 609 F.2d 820, 822–23 (5th Cir.1980). Although the safety code in that case was inadmissible under 803(24) because the "prior notice" requirement was not complied with, that problem does not exist in this case since the Code was listed as an exhibit in Alexander's pre-trial order.

3. Fed.R.Evid., Rule 803(18) provides:
   (18) Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice [are admissible]. If admitted, the statements may be read into evidence but *may not be received as exhibits*. (Emphasis added.)

4. Fed.R.Evid., Rule 803(24) provides:
   (24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, [is admissible] if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evi-

Nevertheless, we reject Alexander's argument that the failure to admit the Code was error warranting reversal of the district court's judgment for two reasons. First, the plaintiff did not urge admission of the Code under Fed.R.Evid. 803(24) at trial. Second, no substantial right of Alexander's was affected by the failure to admit the Code as an exhibit because the relevant sections had already been read and shown to the jury.

## B.

Alexander next challenges the district court's failure to permit her to introduce evidence of post-accident modifications made by Travenol to the skip hoist. The court granted C & D's motion in limine in this regard, stating its opinion that such evidence lacked sufficient probative value of defectiveness and risked confusing and misleading the jury, relying on our recent decision of *Grenada Steel Industries v. Alabama Oxygen Co.*, 695 F.2d 883 (5th Cir.1983). Alexander contends that this evidence was probative and posed no danger of unfair prejudice to C & D.

■ We find the trial court's decision to be squarely within *Grenada Steel*. Holding Fed.R.Evid. 407 [5] applicable to strict liability actions, we stated:

dence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

5. Fed.R.Evid. Rule 407 provides:
   When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another pur-

The jury's attention should be directed to whether the product was reasonably safe at the time it was manufactured .... The introduction of evidence about subsequent changes in the product or its design threatens to confuse the jury by diverting its attention from whether the product was defective at the relevant time to what was done later.

*Id.* at 888. We therefore held that evidence of post-accident modifications, whether made by the defendant or a third party, and where the feasibility of such modifications is not in issue, is properly excludable for its lack of probative value and danger of confusion. *Id.* In the instant case, the trial judge informed counsel that his preliminary ruling on the matter would be reevaluated if feasibility became an issue during the course of the trial. It did not.

This ground of error is without merit.

### C.

Alexander next claims the trial court erred in allowing Doyle Weeks, a co-worker of Bud Alexander, to testify in regard to statements made to him by Alexander prior to the accident in question. Weeks testified that Bud Alexander, in response to a question posed by Weeks, stated that if the skip hoist's cables or drive chain broke or became disconnected while the hopper was elevated, the hopper would fall. C & D offered these statements to prove Bud Alexander's knowledge of the skip hoist's mechanical condition and thus his assumption of the risk. The plaintiff argues that Weeks' testimony was hearsay and clearly inadmissible.

■■ Rule 801(c), Federal Rules of Evidence, defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

The reasons for excluding hearsay are clear: when an out-of-court statement is offered as a testimonial assertion of the truth of the matter stated, we are vitally interested in the credibility of the out-of-court declarant. Because a statement made out of court is not exposed to the normal credibility safeguards of oath, presence at trial, and cross-examination, the jury has no basis for evaluating the declarant's trustworthiness and thus his statement is considered unreliable. McCormick on Evidence § 245 (2d ed. 1972); 5 Wigmore on Evidence §§ 1361, 1362 (1974); *United States v. Carter,* 491 F.2d 625 (5th Cir.1974).

*United States v. Parry,* 649 F.2d 292, 294–95 (5th Cir.1981). Weeks' testimony was not offered to prove that the hopper would indeed drop if the cables or drive chain broke, however. Rather, his testimony was offered as evidence of Alexander's *knowledge* of that supposed fact.

Implicit in both the definition and justification for the rule, however, is the recognition that whenever an out-of-court statement is offered for some purpose other than to prove the truth of the matter asserted, the value of the statement does not rest upon the declarant's credibility and, therefore, is not subject to attack as hearsay.

*Id.* Accord, *United States v. Jackson,* 621 F.2d 216 (5th Cir.1980); *United States v. Herrera,* 600 F.2d 502 (5th Cir.1979); *United States v. Rubin,* 591 F.2d 278 (5th Cir.), *cert. denied,* 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979).

We consequently find that Weeks' testimony was not subject to Rule 802's hearsay prohibition and was properly admitted.

### D.

Alexander's final point of error concerns the trial court's admission into evidence of deposition excerpts of defense witness Rosa Burchfield. Burchfield, a Travenol employee, was called by the defendant to

---

pose, such as proving ownership, control, or feasibility of precautionary measures, if con-

troverted, or impeachment.

testify concerning the position of the hopper shortly before the accident. Her testimony was inconsistent with her deposition testimony, and defense counsel attempted to impeach her by questioning her regarding that prior testimony. She was then properly cross-examined by plaintiff's counsel. Later, after Burchfield had been discharged, the district court allowed C & D to introduce as substantive evidence excerpts from her deposition. The excerpts were admitted under Rule 801(d)(1), which provides in pertinent part:

A statement is not hearsay if—

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition.

▮ Alexander argues that the Rule contemplates admission of inconsistent statements as substantive evidence only when offered as such while the witness is on the witness stand. We disagree. The Rule does not restrict the time for formal submission and admission of such evidence, so long as the essential requirements of the Rule are met: (1) the declarant testifies at the trial; (2) the declarant is subject to cross-examination concerning the statement; (3) the statement is inconsistent with his present testimony; and, (4) the statement was given under oath. While it may be the better practice to proffer the inconsistent statement while the witness is still on the witness stand, no such requirement is mandated by the Rule or its underlying rationale. Where, as in this case, opposing counsel has had full opportunity to cross-examine the witness regarding the prior inconsistent statements, no error exists in admitting the statements after the witness has been discharged.

Because the plaintiff has identified no error in the proceedings below warranting reversal, the judgment of the district court is

AFFIRMED.