

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-9-2003

# Grazier v. Philadelphia

Precedential or Non-Precedential: Precedential

Docket 01-3284

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Grazier v. Philadelphia" (2003). *2003 Decisions.* Paper 512.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/512

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed May 9, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3284

TIERRA GRAZIER, MINOR, BY AND THROUGH HER
MOTHER TONIA WHITE; AND DWAYNE CAMPBELL,

Appellants

v.

THE CITY OF PHILADELPHIA; THOMAS HOOD, POLICE
OFFICER, BADGE NO. 7426; ANTHONY SWINTON,
POLICE OFFICER, BADGE NO. 6819, INDIVIDUALLY,
AND IN THEIR OFFICIAL CAPACITY AS POLICE
OFFICERS FOR THE CITY OF PHILADELPHIA

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 98-cv-06063)
District Judge: Honorable Petrese B. Tucker

Argued June 24, 2002

Before: BECKER, *Chief Judge*,* ALITO and AMBRO, *Circuit
Judges*

(Opinion filed: May 9, 2003)

---

* Judge Becker completed his term as Chief Judge on May 4, 2003.

Garrett D. Page, Esquire (Argued)
Richard W. Rogers & Associates
619 DeKalb Street
Norristown, PA 19401
  *Attorney for Appellant*

Marcia Berman, Esquire
Eleanor N. Ewing, Esquire (Argued)
City of Philadelphia,
 Law Department
1515 Arch Street
One Parkway
Philadelphia, PA 19102

Richard G. Tuttle, Esquire
James A. Rocco, III, Esquire
 (Argued)
Kolansky, Tuttle & Rocco
1429 Walnut Street, Suite 1300
Philadelphia, PA 19102
  *Attorneys for Appellees*

---

**OPINION OF THE COURT**

---

AMBRO, *Circuit Judge*:

Dwayne Campbell and Tierra Grazier brought this 42 U.S.C. § 1983 action against Philadelphia police officers Thomas Hood and Anthony Swinton as well as the City of Philadelphia. They allege that Hood and Swinton violated their Fourth and Fourteenth Amendment rights by shooting at them in the course of a traffic stop and that the City failed to train these officers properly. At the close of the plaintiffs' case-in-chief, the District Court granted judgment as a matter of law for the City on the basis that the plaintiffs could not satisfy the stringent requirements for municipal liability. The case against Officers Hood and Swinton went to the jury, which found them not liable for any constitutional violations. In a post-trial memorandum,

the District Court denied the plaintiffs' motion for a new trial. We affirm.[1]

## I. Factual Background

On October 3, 1997, Officers Hood and Swinton were patrolling Philadelphia in an unmarked police car and in civilian clothes. Officer Hood was wearing a Philadelphia Phantoms hockey jersey, blue jeans, and black high top uniform boots, with his badge hanging from a chain around his neck. Officer Swinton was wearing a multi-colored flannel shirt, blue jeans, white baseball cap, and white sneakers. Both officers were relatively new on the job, and this was the first time that either had been assigned to this type of plainclothes duty.

According to the officers, at approximately 8:00 p.m. a car passed them at high speed in a non-traffic lane. Hood and Swinton followed the vehicle, which Campbell was driving with his young cousin Grazier in the back seat, to the next intersection, where Campbell had stopped for a light. Notwithstanding that, under Philadelphia Police Department regulations, it is "preferable" that plainclothes officers not make traffic stops,[2] Hood drove his car around Campbell's, blocking him perpendicularly in the intersection.[3] Hood and Swinton emerged from the unmarked car and, according to them, displayed their police badges and said "Police, Don't Move." Campbell contends that he could not hear what the officers said because his windows were closed and the radio was playing. Because Hood and Swinton drew their guns and

1. We have jurisdiction under 28 U.S.C. § 1291, which permits appeals from final decisions of the district courts.

2. *See* Directive 92(I)(A)(1) ("It is preferable that an officer making a stop for a traffic violation be in uniform."); Directive 92(II)(J) ("Police Officers in plainclothes and detectives will not routinely make traffic stops unless the actions of the violator are a clear danger to pedestrian or vehicular traffic and no marked unit is readily available.").

3. It appears that this particular maneuver also violated Philadelphia Police Department regulations. *See* Directive 92(II)(A) ("Personnel will make every effort to direct the operator to a suitable stopping point where normal traffic flow will not be impeded.").

because they were dressed in plain clothes, Campbell believed that he was being carjacked. Panicked, he threw his car into reverse and backed into another car. He then drove forward either at Hood or in his direction. Hood fired four shots at Campbell's car, three of which struck Campbell. The shot that injured Campbell most severely, the last of the four, arguably was not discharged until after his vehicle was pulling away from the officers. No bullets hit Grazier, though she was showered in broken glass.

Following an inquiry, the Philadelphia Police Department determined that Hood violated police Directives 10[4] and 92, which govern the use of deadly force and vehicle investigations, respectively. Hood was suspended thirty days for using his firearm improperly. Swinton was investigated but not disciplined. He neither drove the unmarked police car nor fired any shots at Campbell's car.

The City has promulgated numerous directives, like Directives 10 and 92, to inform its officers of proper procedures. In addition, the City responded to this incident consistently with its established procedure of investigating all firearms discharges by its police officers. When the City finds a violation, it disciplines the offending officer, including requiring a full day of firearms instruction. Furthermore, the City requires annual firearms retraining for all officers. The plaintiffs do not appear to claim that the City did not investigate these incidents and discipline the offending officers. They question the *level* of discipline and training, contending, among other things, that more extensive firearms retraining was necessary.

## II.  Discussion

We address first the plaintiffs' municipal liability claim, then their claim that the Court erred in instructing the jury on the claims against the individual officers, and last the claim that the District Court erred by not overturning the jury's verdict of no liability.

---

4. Directive 10 instructs officers, among other things, to "exhaust all other reasonable means of apprehension and control before resorting to the use of deadly force."

## A.  Municipal Liability

The District Court granted the City's motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). We exercise plenary review over that decision. *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995). "A district court should grant such a motion only if, viewing all the evidence in favor of the nonmoving party, no reasonable jury could find liability on a particular point." *Id.* (citing *McDaniels v. Flick*, 59 F.3d 446, 454 (3d Cir. 1995)).

The plaintiffs argue that the City is liable because it followed a policy of failing to train its officers in proper firearm and vehicle investigation techniques. The District Court concluded that no reasonable jury could find municipal liability from the facts that plaintiffs allege. In its post-trial memorandum, the District Court added another rationale for this ruling: the City cannot be liable on a failure to train theory for conduct that a jury determined did not violate the plaintiffs' constitutional rights. *City of Los Angeles v. Heller*, 475 U.S. 796 (1986) (per curiam). Either reason independently supports the Court's judgment for the City.

### 1.  Municipal liability requires constitutional harm

The District Court correctly determined that any error in granting judgment for the City at the close of the plaintiffs' case would have been rendered harmless by the jury's verdict of no liability against Hood and Swinton. There cannot be an "award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." *Heller*, 475 U.S. at 799. Because the jury in this case found no constitutional violation, *Heller* precludes a finding of municipal liability against the City. This conclusion follows naturally from the principle that municipal liability will only lie where municipal action actually caused an injury. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (observing that a City "may be held liable if its policy *actually causes injury*") (emphasis added).[5]

---

5. "Our Court has distinguished *Heller* in a substantive due process context, *Fagan v. City of Vineland*, 22 F.3d 1283, 1291-94 (3d Cir.

2. **No reasonable jury could find liability on the merits.**

Even if *Heller* did not bar municipal liability, the District Court correctly rejected on the merits the plaintiffs' claim against the City. The Supreme Court set out the framework for establishing municipal liability on a failure to train theory in *Harris*, 489 U.S. at 388, which drew on the principles announced in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). A City's failure to train its police officers must reflect a deliberate or conscious choice by policymaking officials, such that one could call it the City's policy or custom. The failure to train must "amount[ ] to deliberate indifference to the rights of persons with whom the police come into contact." *Harris*, 489 U.S. at 388; *see also Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997). Moreover, the City's decisions must be the "moving force" behind an actual constitutional violation. *Harris*, 489 U.S. at 389.

"The scope of failure to train liability is a narrow one." *Brown v. Muhlenberg Tp.*, 269 F.3d 205, 215 (3d Cir. 2001). This is particularly true where, as here, the plaintiffs merely allege that a different training program than the one

1994), but not in a way relevant to this case. In *Fagan*, we observed that a municipality could remain liable, even though its employees are not, where the City's action itself is independently alleged as a violation and the officer is merely the conduit for causing constitutional harm. *Id.* at 1292. We were concerned in *Fagan* that, where the standard for liability is whether state action "shocks the conscience," a city could escape liability for deliberately malicious conduct by carrying out its misdeeds through officers who do not recognize that their orders are unconstitutional and whose actions therefore do not shock the conscience. *Id.* Here, however, like *Heller* and unlike *Fagan*, the question is whether the City is liable for causing its officers to commit constitutional violations, albeit no one contends that the City directly ordered the constitutional violations. Therefore, once the jury found that Hood and Swinton did not cause any constitutional harm, it no longer makes sense to ask whether the City caused them to do it. Additionally, recognizing that *Heller* had addressed a closely related issue, we carefully confined *Fagan* to its facts: a substantive due process claim resulting from a police pursuit. *Id.* By contrast, both this case and *Heller* involve primarily a Fourth Amendment excessive force claim.

in place would have been more effective. *See id.* at 216 ("To survive summary judgment on a failure to train theory, the [plaintiffs] must present evidence that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference.") (citation omitted).

Plaintiffs did not introduce evidence sufficient to support a jury finding that the City's police training is so obviously inadequate that it amounts to deliberate indifference to the rights of its citizens. *Brown*, 269 F.3d at 216. The City enforces directives that reflect proper police procedure. The directives require officers to use force only as a last resort to avoid death or serious bodily injury, and to take all reasonable steps to avoid making the use of force necessary. Other directives instruct officers on proper vehicle investigation techniques and discourage vehicle stops by unmarked officers. When the City finds a violation, it retrains that officer in the proper use of firearms and metes out disciplinary measures if appropriate. Ironically, this very case involves an example of the City's disciplinary process in motion. The plaintiffs complain that the City provides insufficient "field training" and fails to instruct its officers in "shoot/no shoot" procedures. However, the evidence showed that the City does provide extensive on-the-job training, if not always in precisely the form that plaintiffs would prefer.

Moreover, even if plaintiffs could show deliberate indifference, they would also have to prove that the City's inadequate training policies were the "moving force" behind their injuries. *Harris*, 489 U.S. at 389; *Bryan County*, 520 U.S. at 405. This is at base a causation requirement. *See Bryan County*, 520 U.S. at 404 (stating that the "moving force" standard requires a "direct causal link between the municipal action and the deprivation of federal rights"). As the Supreme Court said in *Harris*:

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in

injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable. . . .

[F]or liability to attach in this circumstance, the identified deficiency in a city's training program must be closely related to the ultimate injury.

489 U.S. at 390-91. In this case, plaintiffs cannot point to evidence that the officers cut them off and shot at their car because they were trained to do so. To the contrary, the directives instruct officers to follow different procedures. In this context, the District Court properly granted the City's motion for judgment as a matter of law.

## B. The Jury Charge and Verdict Form

Plaintiffs argue that the jury charge did not sufficiently emphasize points in their favor, that the charge incorrectly referred to "unreasonable force" rather than "excessive force," and that the jury should have been given a special interrogatory on whether a seizure occurred. None of these arguments is persuasive.

### 1. Particular emphasis in the jury charge

Plaintiffs raise a series of complaints to the effect that the jury charge should have highlighted specific reasons permitting the jury to find in their favor. First, they contend that the judge should have told the jury to look at the defendants' pre-seizure conduct.[6] Instead, the judge

---

6. The plaintiffs requested the following as part of the jury charge:

When an officer's conduct amounts to more than a minor departure from internal department policy, and particularly where the officer engaged in intentional misconduct, such as when he intentionally does an act knowing it is wrong, you may find that the officer's . . . acts creating the need for force are important in evaluating *reasonableness* of the officer's eventual use of force in this case. Therefore, you may consider that there was more than a minor

instructed the jury that "[a]ll the events transpiring during the officer's encounter with the plaintiffs can be considered in evaluating the reasonableness of Hood's shooting." Second, plaintiffs argue that the judge should have told the jury that Hood and Swinton may have acted unreasonably if they failed to identify themselves properly while working a plainclothes detail. Again, the District Court limited its instruction to more general statements about the meaning of reasonableness.[7] Third, the plaintiffs argue that the District Court erred by informing the jury that Officer Hood's suspension for violating police procedure does not necessarily prove that he acted unreasonably under the Fourth Amendment. In each instance about which the plaintiffs complain, the judge told counsel that he would instruct the jury on the established understanding of reasonableness for excessive force claims, but that counsel was free to argue more specific points in their favor at closing.

We review the District Court's decision to use particular language in the jury charge for abuse of discretion. *Cooper Dist. Co. v. Amana Refrigeration, Inc.*, 180 F.3d. 542, 549 (3d Cir. 1999). We have said that, in evaluating jury

---

departure from Internal Department Policy when it indicates in the Internal Affairs Report itself that Officers Hood and Swinton improperly blocked Mr. Campbell's car in front, failed to radio, and/or communicate important information regarding the car for an investigation as directed by Directive 92, exited their unmarked vehicle, dressed in plainclothes civilian attire, approached the Campbell car they blocked from the front, and then placed themselves in harm[']s way.

Appellant's Br. 23-24.

7. Specifically the Court instructed the jury that

[y]ou must determine whether the amount of force used to effect the stop was that which a reasonable officer would have employed in effectuating the stop under similar circumstances. In making this determination, you may take into account the reason for the stop, the severity of the crime or the violation, whether plaintiffs posed an immediate threat to the safety of the defendants or others, and whether the plaintiffs actively resisted or attempted to evade the stop.

instructions, we shall only find discretion abused "if the instruction was capable of confusing and thereby misleading the jury." *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1195 (3d Cir. 1984); *see also Bolden v. S.E. Pa. Transp. Auth.*, 21 F.3d 29, 33 (3d Cir. 1994) (same) (citing *Waldorf v. Shuta*, 896 F.2d 723, 740 (3d. Cir. 1990)). Likewise, the "district court has substantial discretion with respect to specific wording of jury instructions and need not give [a] proposed instruction if essential points are covered by those that are given." *Douglas v. Owens*, 50 F.3d 1226, 1233 (3d Cir. 1995) (citing *Heller Int'l Corp. v. Sharp*, 974 F.2d 850, 860 (7th Cir. 1992)).

A District Court does not abuse its discretion by refusing to emphasize legal inferences favoring one side. Emphasizing arguable inferences to jurors is the job of advocates, not courts. *See Brewer v. City of Napa*, 210 F.3d 1093, 1097 (9th Cir. 2000) (finding no abuse of discretion in the District Court's refusal in an excessive force case to apply the law more specifically to the facts in its jury charge because "the instructions given 'fairly and adequately cover[ed] the issues presented,' *and provided Brewer with ample room to argue his theory of the case to the jury*, i.e., that [the officers] had options available to them other than ordering a police dog to attack.") (citation omitted) (emphasis added); *Alexander v. Conveyors & Dumpers, Inc.*, 731 F.2d 1221, 1227 (5th Cir. 1984) (per curiam) ("Counsel had the opportunity to emphasize the matters in his favor contained in these proposed instructions during jury argument and we decline to hold that the trial court erred in refusing them.").

Moreover, the District Court's charge that violations of police procedure are not necessarily constitutional violations comports with established Supreme Court precedent. *See Davis v. Scherer*, 468 U.S. 183, 193-95 (1984). That portion of the charge did not cross the prejudicial propriety line because its only effect was to avoid a possible misunderstanding by the jury.

In a related assertion of error, the plaintiffs contend the Court should have instructed the jury that an officer acts unreasonably if his improper conduct creates the situation

making necessary the use of deadly force. *See Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993); *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1501-02 (11th Cir. 1985) (*en banc*). However, we also note that the plaintiffs never requested the jury charge that our dissenting colleague would issue — "that conduct on the officers' part that unreasonably precipitated the need to use deadly force may provide a basis for holding that the eventual use of deadly force was unreasonable in violation of the Fourth Amendment." (Plaintiffs instead sought a charge that linked Fourth Amendment reasonableness to compliance with local police regulations and thus would have made constitutional standards vary from jurisdiction to jurisdiction. *See supra* note 6.) In the absence of such a request by the plaintiffs, we review the District Court's actual instruction for plain error only. *United States v. Olano*, 507 U.S. 725, 731-32 (1993).

Our Court has not endorsed the doctrine discussed in *Gilmere* and *Starks* and, in fact, has recognized disagreement among circuit courts on this issue. *See Abraham v. Raso*, 183 F.3d 279, 295-96 (3d Cir. 1999). In *Abraham*, we announced that "[w]e will leave for another day how these cases should be reconciled." *Id.* at 296. In this context, the District Court did not abuse its discretion by refusing to instruct the jury on a doctrine that our Circuit has not adopted. As such, plain error of course did not occur.

Our dissenting colleague also parts with us on this issue in a more general way. Jury instructions, he writes, are "the didactic exercise of providing the jury with guidance as to how. . . [legal] principles apply to the evidence presented and how the factual disputes bear on the ultimate outcome." While acknowledging "the key role of counsel in arguing the facts to the jury and explaining their significance," nonetheless our colleague believes that "there are some cases in which the failure to explain the significance of key facts does constitute a breach of the trial judge's duty," and "this is one of them."

Our pause with this approach is simply this: to adopt it puts courts on the slippery slope to interfering with (indeed substituting for) counsel's advocacy and ultimately

intruding on the jury's job of finding facts. What our colleague suggests may, in a perfect world with a perfect jury instruction, not interpose the judge in the jury room. But our world is not perfect. Until it is, engrafting evidence to argument is the home turf of counsel. Laying out a level (even if plain) canvas for counsel to color is the court's model role. When (as in this case) a court does this, it is hardly an abuse of discretion.

### 2. Use of "unreasonable force" rather than "excessive force" on verdict form

Plaintiffs contend that the Court erred by drafting a verdict slip that asked whether the defendants used "unreasonable force" when it should have said "excessive force." This contention merits little discussion. The Fourth Amendment refers to "unreasonable searches and seizures" — the phrase "excessive force" is merely a shorthand for one type of Fourth Amendment claim. We do not believe that this slightly different terminology affected the jury's outcome.

### 3. Lack of a special interrogatory on seizure

Plaintiffs also argue that the District Court should have instructed the jury to find whether a seizure occurred. The Court declined to do so because it found a seizure as a matter of law. That ruling benefitted the plaintiffs. They have no right to a jury finding on an issue decided in their favor as a matter of law.

### C. New Trial Motion

Plaintiffs sought a new trial under Federal Rule of Civil Procedure 59 on the basis that the verdict was against the weight of the evidence. The District Court denied that motion. We review the denial of a new trial motion for abuse of discretion. *Waldorf v. Shuta*, 142 F.3d 601, 621 (3d Cir. 1998). "In reviewing the district court's denial of [a] new trial motion, we must view the evidence in the light most favorable to the non-moving party." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 1999) (citation omitted). We have said that "new trials because the verdict is against the weight of the evidence are proper only when

the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

This case does not approach the high threshold for granting a new trial. The jury heard (as is typical) occasionally inconsistent testimony from both sides and could have concluded that Hood and Swinton acted in reasonable fear for their lives when Hood fired his gun at Campbell's oncoming car. Established Fourth Amendment precedent gives officers considerable leeway when making "split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The proper standard is not what an officer would do "with the 20/20 vision of hindsight." *Id.* at 396. In deciding an appeal from a judgment entered after a jury trial, we must respect the jury's important role in our legal system and therefore may not substitute our view of the evidence for that of the jury.

\* \* \* \* \*

The District Court's judgment supporting the jury verdict is affirmed.

BECKER, *Chief Judge*,* *Dissenting*:

I join in Part II.A of the majority opinion (Municipal Liability), as well as Parts II.B.2 and 3 (use of "unreasonable force" in jury charge and lack of a special interrogatory on seizure). I disagree with, hence I do not join in Part II.B.1 (Particular Emphasis on Jury Charge); I therefore write separately on that issue. Because I would reverse and remand for a new trial on account of what I view as a deficiency of the jury charge, I do not reach Part II.C (New Trial Motion).

I.

As in most cases of this genre, the facts are critical. Especially important are the following: (1) that Officers Hood and Swinton were in plain-clothes; (2) that under Philadelphia Police Regulations, officers in plain-clothes may not make traffic stops, hence Hood and Swinton violated this policy in stopping Campbell's car; (3) that the officers also violated Philadelphia Police regulations by pulling perpendicularly in front of Campbell's car to stop it;[1] (4) that Campbell believed that he was being carjacked; and (5) that the shot that maimed Campbell, the fourth shot fired by the officers, was arguably not discharged until *after* Campbell's vehicle was heading away from the officers at which time he could not have posed a danger to them. The majority opinion notes these facts but does not acknowledge that: (6) under these circumstances, it was reasonable for Campbell, who denies that the slovenly-dressed officers showed identification, thought that he might be facing a carjacking, which in turn furnished the motivation to escape; and (7) under these circumstances, the perceived need to use force was arguably created by the misconduct of the officers themselves.

---

* Judge Becker completed his term as Chief Judge on May 4, 2003.

1. The Police Department's Internal Affairs Division found that Hood violated Police Department Directive 10, regarding use of deadly force, and Directive 92, which instructs officers in plain-clothes not to make stops for traffic violations.

II.

In my view, these facts and permissible inferences posed an important legal issue with which the District Court should have but did not come to grips, resolution of which should have resulted in a charge much more favorable to the plaintiffs. In *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), we established, as a general matter, the relevance of officers' pre-seizure conduct to determining whether use of force during the seizure is excessive. *Raso* left open, however, the question of how much weight an *officer's* unreasonable creation of danger should be given in the calculus of whether the officer's use of force was ultimately reasonable under the Fourth Amendment.

Without laying down a blanket rule (which perforce I obviously cannot do as a dissenting judge) I would decide that issue by holding that if the officer's conduct unreasonably creates the need to use deadly force in self-defense, that conduct may render the eventual use of deadly force by the officer unreasonable in violation of the Fourth Amendment, even if the officer reasonably believed that such force was necessary to prevent death or severe bodily injury. *See Estate of Starks v. Enyart*, 5 F.2d 230, 234 (7th Cir. 1993) ("Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force."); *cf. Gilmere v. City of Atlanta*, 774 F.2d 1495, 1501 (11th Cir. 1985) ("[A] moment of legitimate fear should not preclude liability for a harm which largely resulted from [an officer's] own improper use of his official power.").

III.

The art of instructing the jury is not the rote recitation of controlling legal principles, quoted verbatim from the case law, but the didactic exercise of providing the jury with guidance as to how those principles apply to the evidence presented and how the factual disputes bear on the ultimate outcome. *Cf. Ayoub v. Spencer*, 550 F.2d 164, 167 (3d Cir. 1977) ("While a comprehensive review of the evidence is not generally required, the District Court's

failure, here to relate the parties' contentions to the law . . . left the jury without guide or compass to aid it in rationally reaching a decision."). In my view, the District Court's "vanilla" charge — "you may consider all the factors (argued by counsel)" — was not adequate because it lacked guidance on the issue just described in Part II of this (dissenting) opinion.

## A.

First, I believe that it was an abuse of discretion for the trial judge not to explain to the jury at least the general principle that conduct on the officers' part that unreasonably precipitated the need to use deadly force may provide a basis for holding that the eventual use of deadly force was unreasonable in violation of the Fourth Amendment. The closest the District Court came to instructing the jury on this point was when it directed the jury to consider "the totality of the circumstances" and "[a]ll of the events transpiring during the officers' encounter."

The instructions preceding and following these particular instructions, however, focused on whether a reasonable officer in Hood's position would have believed that *he* was in danger of death or severe bodily injury when he fired the shots:

> In evaluating the reasonableness of the use of force in this situation, you must ask yourselves the following question: giving due regard to the pressures faced by the police, was it objectionably [sic] reasonable for the officer to believe, in light of the totality of the circumstances, that the subject posed a significant threat of death or serious physical injury to the officer or others, and that deadly force was necessary to prevent the suspect from causing serious physical injury or death.
>
> . . .
>
> The determination of reasonableness must embody allowance for the fact that police officers are forced to make split-second judgments — in circumstances that are tense, uncertain and rapidly evolving — about the

> amount of force that is necessary in a particular situation. All of the events transpiring during the officers' encounter with the plaintiffs can be considered in evaluating the reasonableness of the shooting.

A. 124-26.

This charge clearly favored the defendants. In this context, the jury was likely to have understood the "totality of the circumstances" and "[a]ll of the events transpiring during the officers' encounter" to refer to the circumstances that would lead a reasonable officer in Hood's position to believe that he was in danger of death or severe bodily injury at the time he fired, and not to conduct on the officers' part that unnecessarily precipitated the need to use deadly force.

As I would decide the question reserved in *Raso*, an officer's use of deadly force may violate the Fourth Amendment even if the officer reasonably believed that the use of deadly force was necessary to prevent death or severe bodily injury. What the District Court told the jury was that an officer "is justified in the use of any force which is believed to be necessary to effect the stop and of any force which he or she reasonably believes to be necessary to defend himself or another from serious bodily injury." A. 126. This instruction, in my view, improperly prevented the jury from finding for the plaintiffs if the jury concluded that a reasonable officer in Hood's position would have believed he was in danger of being run over at the time he fired the shots but that the officers had unreasonably placed themselves in a position in which the use of deadly force would be necessary. Inasmuch as I believe that the District Court's failure to charge in accordance with the principles outlined was legal error (which itself is an abuse of discretion), I find grounds to set aside the judgment.

## B.

Second, I think that the jury needed guidance on the "signature" facts of the case: that the defendants were plain-clothes officers, forbidden by Regulations to make traffic stops, and that the officers were driving an unmarked car (in a high crime neighborhood) which they

pulled perpendicularly in front of plaintiffs' car to make a traffic stop, also in violation of department policy. I believe the jury should have been told explicitly that it could consider such matters in determining the reasonableness of the officers' conduct.

I also think that the court should have explained to the jury the relevance of the disputed questions of fact, such as whether the officers exited the car with guns drawn and failed to identify themselves, as Campbell testified, and whether a reasonable officer in Hood's position would know that he was out of danger when he fired the last shot, which entered the back of Campbell's car and lodged in the base of his brain. Plaintiffs' accident expert, who analyzed each of the four shots fired by Hood and the position of the car at the time of the shots, testified that if Hood fired the shots in one second, which the expert thought was likely, the final shot, which went into the car's back windshield, would have been fired when the car was 32 feet up the road from Hood. A.394. If, as Hood testified, he fired the shots in two seconds, the final shot would have been fired, according to plaintiffs' expert, when the car was 120 feet from Hood. A.394. This testimony was unrebutted by any defense expert.

## C.

Notwithstanding the foregoing discussion, I do not maintain that the District Court has an obligation to review all the evidence with the jury and to explain to it the significance of all major evidence in the case. Concomitantly, I acknowledge the key role of counsel in arguing the facts to the jury and explaining their significance. But there are some cases in which the failure to explain the significance of key facts does constitute a breach of the trial judge's duty; in my view this is one of them. A trial judge who simply tells the jury to consider the totality of the circumstances and leaves it to the lawyers to point out the particular circumstances favorable to their clients, in my view, fails to "adequately submit[ ] the issues in the case to the jury." *In re Merritt Logan, Inc.*, 901 F.2d 349, 359 (3d Cir. 1990).

I add that I do not believe that to explain the significance of the facts that I have stressed, against the background of the applicable law (which under my view of the case the District Court did not cover) would constitute "slanting." The facts are the facts, and they can be set forth in a balanced way. The jury could also have been instructed on the relevance of the evidence supporting the defendants' case. The mere fact that some facts favor one side or another is no reason not to explain their significance. The judge's job is to give guidance to a lay jury, not to leave it adrift.

## IV.

I have no idea what a properly charged jury would do in this case. The jury may believe that the officers, genuinely fearing for their lives, acted reasonably. But it may also believe that Campbell, who had just come from dropping his grandmother off at church, with his minor cousin Tierra Grazier being the passenger in the rear seat, would prevail. At all events, I think that the failure of the District Court to give the jury adequate guidance on either the law or the facts constitutes an abuse of discretion. I would therefore set aside the judgment and grant the plaintiffs a new trial. I respectfully dissent.

A True Copy:
     Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*